1  MICHAEL C. OSBORNE (SBN: 95839)
   ANTHONY J. CAPOZZOLA (SBN 250024)
2  SHOOK, HARDY & BACON L.L.P.
   333 Bush Street, Suite 600
3  San Francisco, California 94104-2828
   Telephone:    (415) 544-1900
4  Facsimile     (415) 391-0281

5  Attorneys for Plaintiff
   ENRICO GARGALE
6

*E-filing*

**ORIGINAL FILED**

JUL 0 1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7

8           **UNITED STATES DISTRICT COURT**

9          **NORTHERN DISTRICT OF CALIFORNIA**

**PVT**

10
                    **CV  08    3167**
11

| | |
|---|---|
| 12  ENRICO GARGALE, | ) Case No. |
| | ) |
| 13        Plaintiff, | ) **COMPLAINT** |
| | ) |
| 14    vs. | ) **1, 3, 5, 7, 9, 11, 13:  BREACH OF** |
| | ) **CONTRACT – DAMAGES** |
| 15  FORTINET, INC., A Delaware Corporation, | ) |
| and DOES 1 through 50, inclusive, | ) **2, 4, 6, 8, 10, 12, 14:  BREACH OF** |
| 16 | ) **CONTRACT – SPECIFIC PERFORMANCE** |
|         Defendants. | ) |
| 17 | ) **15: BREACH OF THE IMPLIED** |
| | ) **COVENANT OF GOOD FAITH AND FAIR** |
| 18 | ) **DEALING** |
| | ) |
| 19 | ) **16: BREACH OF FIDUCIARY DUTY** |
| | ) |
| 20 | ) **17: CONVERSION** |
| | ) |
| 21 | ) **18: FRAUD** |
| | ) |
| 22 | ) **19: NEGLIGENT MISREPRESENTATION** |
| | ) |
| 23 | ) **20: CONSTRUCTIVE FRAUD** |
| | ) |
| 24 | ) **21: UNFAIR BUSINESS PRACTICES** |
| | ) |
| 25 | ) **22: QUANTUM VALEBANT/QUANTUM** |
| | ) **MERUIT** |
| 26 | ) |
| | ) **JURY TRIAL DEMANDED** |

27

28

1

141257v2

Plaintiff Enrico Gargale (hereinafter referred to as "Plaintiff") alleges as follows:

## THE PARTIES

1.    At all times herein mentioned, plaintiff Enrico Gargale was a resident and citizen of Italy.

2.    At all times herein mentioned, defendant Fortinet, Inc. (hereinafter referred to as "Fortinet"), was a Delaware corporation with its principal place of business located in Santa Clara County, State of California.

3.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants sued as DOES 1 through 50, are unknown to Plaintiff, who therefore sues said defendants, and each of them, by such fictitious names. Plaintiff will amend this complaint to show their true names and capacities when the same have been ascertained.

4.    Each of the defendants designated as DOE is responsible in some manner for the events and happenings hereinafter referred to, and is therefore liable to Plaintiff as alleged herein.

5.    All defendants acted as agents and employees of one another, and Defendants performed the acts and omissions complained of herein in the course and scope of such agency and employment, and, as a result, all defendants are jointly and severally liable with respect to all claims asserted herein by Plaintiff.

## JURISDICTION AND VENUE

6.    The jurisdiction of the United States District Court over this matter is appropriate, pursuant to 28 U.S.C. § 1332(a), in that there exists complete diversity of citizenship of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper in the Northern District of California, pursuant to 28 U.S.C. § 1391(a), in that a defendant resides in this judicial district and in that a substantial part of the events and omissions giving rise to the claims stated herein occurred in this judicial district.

## INTRADISTRICT ASSIGNMENT

7.    Assignment of this matter to the San Jose Division is appropriate, under Civil Local Rule 3-2(c), as this action arises in Santa Clara County in that a substantial part of the events and omissions giving rise to the claims stated herein occurred in Santa Clara County.

COMPLAINT

141257v2

1                        **FACTUAL BACKGROUND**

2                           **A. INTRODUCTION**

3       8.     According to its website, Fortinet "is the pioneer and world's leading provider of

4 Unified Threat Management (UTM) security systems that enable secure business communications"

5 and its security systems and subscription services "protect the networks of more than 20,000

6 customers nationwide – including telecommunications carriers, service providers and enterprises of

7 all sizes." Fortinet has identified itself on its website as "the leading privately-held network security

8 company." Fortinet's website boasts that it has received "more than $100 million in funding from

9 the industry's leading venture capital firms." This litigation is brought in an effort to require

10 Fortinet to honor its contractual obligations to Plaintiff, who provided Fortinet with services that

11 resulted in the promotion and sales of Fortinet's products and services in Europe and elsewhere.

12   **B. PRELIMINARY NEGOTIATIONS BETWEEN PLAINTIFF AND DEFENDANTS**

13       9.     Plaintiff is an attorney in Italy who provides promotional and other services to

14 various companies. In early 2005, Fortinet contacted Plaintiff upon recommendations of Fortinet's

15 subsidiary in Italy, and Fortinet and Plaintiff began discussing and negotiating Plaintiff's possible

16 role in assisting Fortinet to develop its market share in the "EMEA" region (Europe, The Middle

17 East, and Africa). Plaintiff negotiated directly with Jens Andreassen, Fortinet's Vice President of

18 International Sales (hereinafter referred to as "Andreassen"). As part of the negotiations,

19 Andreassen acknowledged that Fortinet offered "advisors" "stock vested on a monthly basis." (E-

20 mail, Andreassen to Plaintiff, dated February 17, 2005). By e-mail dated on or about March 4, 2005,

21 from Andreassen to Plaintiff, Andreassen stated that a written agreement had been approved by

22 Fortinet's CFO, and the agreement was then with "Legal." Late in the day on or about March 4,

23 2005, Andreassen forwarded by e-mail to Plaintiff a "Board of Advisors Agreement" to Plaintiff,

24 asking for Plaintiff's signature. The final draft of that agreement, with an effective date of March 1,

25 2005, was signed by Plaintiff and was signed on behalf of Fortinet by its President and CEO, Ken

26 Xie. A true and correct copy of that executed agreement (hereinafter referred to as "2005 Board of

27 Advisors Appointment Agreement") is attached as Exhibit A and incorporated herein in full by this

28 reference.

141257v2

1    10.    By e-mail dated on or about April 29, 2005, L. Dianne D. Robinson (with Fortinet's

2 "Corporate Administration") (hereinafter referred to as "Robinson") forwarded to Plaintiff a signed

3 copy of the 2005 Board of Advisors Appointment Agreement and stated, "The Board approved your

4 shares on 04-20-05. Per the agreement, you will be receiving a total of 7,200 shares, in which you

5 will vest 600 shares per month for 12 months (1/12 of total shares vest monthly) which has begun on

6 03-1-05."

7    **C. ISSUANCE OF STOCK OPTION GRANTS A-0870 AND A-0870-1**

8    11.    By e-mail dated on or about May 4, 2005, Robinson forwarded to Plaintiff Fortinet's

9 Stock Option Grant Agreement relating to Stock Option Grant Number A-0870 (hereinafter referred

10 to as "A-0870 Option Grant Agreement"). A true and correct unsigned copy of the A-0870 Option

11 Grant Agreement is attached as Exhibit B and incorporated herein in full by this reference. By e-

12 mail dated on or about August 2, 2005, Robinson forwarded to Plaintiff a re-issuance of Stock

13 Option Grant Number A-0870, the revised one being renumbered A-0870-1, advising Plaintiff that

14 the number of option received, vesting date, vesting schedule, and option price had not been changed

15 and that the only change was that the exercise of unvested shares would not be permitted. Robinson

16 forwarded to Plaintiff with that e-mail Fortinet's Stock Option Grant Agreement relating to Stock

17 Option Number A-0870-1 (hereinafter referred to as "A-0870-1 Option Grant Agreement"). A true

18 and correct unsigned copy of the A-0870-1 Option Grant Agreement is attached as Exhibit C and

19 incorporated herein in full by this reference. By e-mail dated on or about December 15, 2005,

20 Robinson forwarded to Plaintiff a copy of the A-0870-1 Option Grant Agreement signed on behalf

21 of Fortinet by Todd Nelson, Vice President of Legal and General Counsel, although Plaintiff does

22 not presently have a copy of the signed A-0870-1 Option Grant Agreement.

23    **D. ISSUANCE OF STOCK OPTION GRANT A-1083**

24    12.    By e-mail dated on or about September 14, 2005, Andreassen advised Plaintiff that as

25 of the end of the Second Quarter 2005 (June 30, 2005), Fortinet had reached the first milestone in

26 sales, and he had approval for the issuance to Plaintiff of 16,666 stock options, 100% vested at the

27 time of the grant, with vesting to commence as of October 24, 2005, the date of the next Fortinet

28 Board of Directors meeting. By e-mail dated November 3, 2005, Robinson advised Plaintiff that his

4

141257v2

1  option grant had been approved by the Board of Directors of Fortinet. By the same e-mail, Robinson

2  forwarded to Plaintiff Fortinet's Stock Option Grant Agreement relating to Stock Option Grant

3  Number A-1083 (hereinafter referred to as "A-1083 Option Grant Agreement"). Plaintiff no longer

4  has a copy of the A-1083 Option Grant Agreement. However, its terms and conditions were

5  essentially identical to those set forth in the A-870-1 Option Grant Agreement (Exhibit C). It

6  provided, in part, that Defendants had granted to Plaintiff an option to purchase 16,666 shares of

7  Fortinet's Common Stock, 100% fully-vested at the time of the grant (on or about October 24,

8  2005), with an Exercise Price per share of $1.95. By e-mail dated on or about December 15, 2005,

9  Robinson forwarded to Plaintiff a copy of the A-1083 Option Grant Agreement signed on behalf of

10  Fortinet by Todd Nelson, Vice President of Legal and General Counsel (hereinafter referred to as

11  "Nelson"). A true and correct copy of this e-mail is attached as Exhibit D and incorporated herein in

12  full by this reference.

13  ## E. NEGOTIATION OF 2006 ADVISORS APPOINTMENT AGREEMENT

14  13.    Between December 2005 and February 2006, Fortinet and Plaintiff negotiated for an

15  extension and modification of the 2005 Board of Advisors Appointment Agreement. By e-mail

16  dated on or about February 15, 2006, Andre Stewart, Vice-President of Fortinet EMEA (hereinafter

17  referred to as "Stewart") forwarded to Plaintiff a revised version of the parties' agreement, with an

18  effective date of January 1, 2006 (hereinafter referred to as "2006 Board of Advisors Appointment

19  Agreement"). A true and correct copy of the 2006 Board of Advisors Appointment Agreement is

20  attached as Exhibit E and incorporated herein in full by this reference. Plaintiff signed the 2006

21  Board of Advisors Appointment Agreement and returned it to Fortinet by e-mail dated on or about

22  February 17, 2006. By e-mail dated on or about February 17, 2006, Fortinet forwarded a fully-

23  signed copy of the 2006 Board of Advisors Appointment Agreement, having been signed on behalf

24  of Fortinet by Nelson.

25  ## F. ISSUANCE OF STOCK OPTION GRANT A-1380

26  14.    By e-mail dated on or about November 1, 2006, Sharon Orlando, a Fortinet employee

27  with "Stock Administration," (hereinafter referred to as "Orlando") forwarded to Plaintiff Fortinet's

28  Stock Option Grant Agreement relating to Stock Option Grant Number A-1380 (hereinafter referred

141257v2

1   to as "A-1380 Option Grant Agreement"). Orlando stated in that e-mail, in part, that she was

2   attaching "the newly approved option agreement dated October 26, 2006. She asked Plaintiff to

3   return a signed copy of the agreement. A true and correct unsigned copy of the A-1380 Option

4   Grant Agreement is attached as Exhibit F and incorporated herein in full by this reference. Plaintiff

5   does not presently have a copy of the signed A-1380 Option Grant Agreement. By e-mail dated on

6   or about November 3, 2006, Plaintiff forwarded to Orlando a signed copy of the A-1380 Option

7   Grant Agreement. By e-mail dated on or about November 6, 2006, Orlando confirmed receipt of the

8   "signed agreements," and stated, "Everything looks fine." By e-mail dated on or about November 6,

9   2006, Orlando forwarded to Plaintiff "your most recent stock option granted in October," which was

10  referring again to the A-1380 Option Grant Agreement. Orland also stated in her e-mail,

11  "Congratulations, the Board of Directors has approved your Fortinet, Inc. stock option grant."

12  **G. ISSUANCE OF STOCK OPTION GRANT A-1542**

13       15.    By e-mail dated on or about November 1, 2006, Orlando forwarded to Plaintiff

14  Fortinet's Stock Option Grant Agreement relating to Stock Option Grant Number A-1542

15  (hereinafter referred to as "A-1542 Option Grant Agreement"). A true and correct copy of the A-

16  1542 Option Grant Agreement is attached as Exhibit G and incorporated herein in full by this

17  reference.

18  **H. ISSUANCE OF STOCK OPTION GRANT A-1699**

19       16.    By e-mail dated on or about November 1, 2006, Orlando forwarded to Plaintiff

20  Fortinet's Stock Option Grant Agreement relating to Stock Option Grant Number A-1699

21  (hereinafter referred to as "A-1699 Option Grant Agreement"). A true and correct copy of the A-

22  1699 Option Grant Agreement is attached as Exhibit H and incorporated herein in full by this

23  reference.

24  **I. ISSUANCE OF STOCK OPTION GRANT A-1768**

25       17.    By e-mail dated on or about November 1, 2006, Orlando forwarded to Plaintiff

26  Fortinet's Stock Option Grant Agreement relating to Stock Option Grant Number A-1768

27  (hereinafter referred to as "A-1768 Option Grant Agreement"). A true and correct copy of the A-

28

141257v2

1 | 1768 Option Grant Agreement is attached as Exhibit I and incorporated herein in full by this

2 | reference.

3 | **J. PLAINTIFF'S NEGOTIATIONS WITH DEFENDANTS FOLLOWING**

4 | **TERMINATION OF 2006 BOARD OF ADVISORS APPOINTMENT AGREEMENT**

5 | 18.    In January and February of 2007, Fortinet advised Plaintiff that the 2006 Board of

6 | Advisors Appointment Agreement would not be renewed.  By its terms, the 2006 Board of Advisors

7 | Appointment Agreement terminated one year from the Effective Date of January 1, 2006.

8 | 19.    Plaintiff spoke with Nelson by telephone on or about February 12, 2007, and advised

9 | that Plaintiff intended to exercise his vested stock options.  By e-mail to Nelson dated on or about

10 | February 13, 2007, Plaintiff confirmed the conversation by stating, "Following our phone

11 | conversation of yesterday, I am going to exercise my vested options.  Can you please confirm that

12 | the wire transfer information of Fortinet below is still correct."

13 | 20.    Nelson responded by e-mail dated on or about February 27, 2007, in which Nelson

14 | informed Plaintiff: "I'm sorry to be so slow getting back to you.  As you know I was out on vacation,

15 | and just returned back today.  As I mentioned on the phone before I left, we are currently

16 | experiencing some issues with our administration of options.  We will provide you with an extension

17 | on the window to exercise.  We are also looking into the calculation of the amount of remaining

18 | options, and how to handle the termination period.  Would you please provide me with the number

19 | of options you believe you are entitled to under your contract that you have not yet received, so that I

20 | can cross check our data?"  The e-mail closed, "Please feel free to call me if you have any questions

21 | or concerns.  Kindest regards, Todd."

22 | 21.    By e-mail dated on or about February 28, 2007, Plaintiff responded to Nelson's offer

23 | of an "extension on the window to exercise" by stating:  "It would be fine for me to receive from

24 | Fortinet an extension on the window to exercise the accrued options.  I think that 3 months AFTER

25 | the final sales occurred with in three-month period after the termination of service agreement is ok.  I

26 | will check my figures and the first days of next week I will send you the number of options I think

27 | were out of the calculation.  Meanwhile can you please send me a short declaration granting me an

28 | extension on the window to exercise?"

COMPLAINT

22.    Plaintiff did not receive a response from Fortinet to his request for a declaration granting him the extension.

23.    By e-mail dated on or about March 5, 2007, Plaintiff provided Nelson with the number of options that should be granted, based on Plaintiff's calculations, and repeated his request that "I would be grateful if you will send me a short declaration granting me an extension on the window to exercise while Fortinet is check [*sic*] the precise options according to the signed agreement."

24.    Shortly after the e-mail dated on or about March 5, 2007, Nelson sent Plaintiff a response by e-mail that stated, "Thanks for the information on the calculations.  John Whittle is working on the internal issues with option grants and exercises, and I've copied him on this email. We will communicate with you shortly about the extension, the calculated total, and mechanics of exercising your options."

25.    Hearing nothing, Plaintiff again sent an e-mail to Nelson, with a cc to John Whittle, Fortinet's Vice President and General Counsel (hereinafter referred to as "Whittle"), dated on or about March 15, 2007, in which he asked, "Have you any news on the extention [sic] for the exercise of the option?"

26.    On or about March 16, 2007, Whittle sent an e-mail to Nelson, and others (including Ken Xie, Fortinet's founder and CEO) in which he stated, "Enrico and I just talked.  Todd, let's discuss later today.  Enrico asked that we try to finalize an amendment to his consultancy agreement documenting the understanding by the end of next week."

27.    Hearing nothing, Plaintiff again wrote an e-mail, dated on or about March 26, 2007, to Whittle in which he asked, "Do you have any news of the amendment to my consultancy agreement?"

28.    On or about March 26, 2007, Whittle responded by e-mail, stating to Plaintiff, "Enrico, Todd is putting together a draft amendment that should address your concerns and, as soon as the draft is ready, we will send it to you.  We may need to run it by our auditors to confirm accounting implications, etc. given additional scrutiny around stock options, but we will send it to

1  you as soon as we have the sign-off from the necessary parties. Todd will keep you posted as we

2  know about timing."

3        29.    On or about March 28, 2007, Whittle again responded by e-mail, stating to Plaintiff,

4  "Enrico, we will address this with an amendment. Todd, can you please coordinate directly with

5  Enrico to keep Enrico apprised of timing, etc."

6        30.    On or about March 30, 2007, Nelson sent an e-mail to Plaintiff, stating, "I'm working

7  on the draft agreement to formalize the agreement to your consulting agreement for the

8  extension/transition period. I apologize for the delay. The quarter end had (as usual) kept us very

9  busy recently. I believe I also need to accountants [sic] to review the amendment. So, that may also

10 take some additional time. I'll keep you informed of the progress on this end." Nelson closed the e-

11 mail with: "Thanks for your understanding. Kindest regards, Todd."

12       31.    By e-mail dated on or about April 11, 2007, Whittle again told Plaintiff that he would

13 try to send a draft agreement "next week" and informed Plaintiff that the "exercise window is still

14 closed and likely will remain closed for some time so that this removes some of the urgency."

15       32.    By e-mail dated on or about June 11, 2007, Nelson wrote to Plaintiff: "I'm still

16 working on collecting the data and understanding the legal landscape with regards to your transition

17 and any past compensation. As a preliminary matter I need to understand the mapping of

18 performance milestones to the grant history. Also, I want to insure that we are on the same page

19 with respect to all past grants." Nelson confirmed in that e-mail that "From our stock records, I see

20 the following option grants to you," and he listed six stock option grants:

21       1.    April 20, 2005, for 7,200 shares at $1.95 per share (*see,* A-0870-1 Option

22 Grant Agreement, Exhibit C);

23       2.    October 24, 2005, for 16,666 shares at $1.95 per share (*see,* A-1083 Option

24 Grant Agreement);

25       3.    January 24, 2006, for 33,332 shares at $1.95 per share (*see,* A-1380 Option

26 Grant Agreement, Exhibit F);

27       4.    July 20, 2006, for 16,666 shares at $2.15 per share (*see,* A-1542 Option Grant

28 Agreement, Exhibit G);

COMPLAINT

141257v2

1           5.     July 20, 2006, for 33,332 shares at $2.15 per share (*see*, A-1699 Option Grant

2    Agreement, Exhibit H); and

3           6.     October 26, 2006, for 14,285 shares at $2.40 per share (*see*, A-1768 Option

4    Grant Agreement, Exhibit I).

5          33.    By letter dated October 10, 2007, to Nelson at Fortinet, Plaintiff stated, in part:

6    "Following all our discussion on the terminated advisory agreement, I hereby formally request to

7    exercise all stock options granted to myself according to the above mentioned terminated agreement.

8    [¶] Please note that such request was already addressed by email on February 13, 2007 (see copy

9    attached) and for which I have been told that the exercise window was closed (see copy of email

10    attached). [¶] I wish to define the exercise of the granted option as soon as possible according to the

11    terms of the International Stock Option Agreement."

12          34.    By e-mail dated on or about October 29, 2007, from Whittle to Plaintiff, Whittle

13    confirmed their discussions earlier that day concerning "the open issues around the stock options."

14    Whittle continued: "As discussed, I am writing to confirm that the current intent of the Fortinet

15    Board for terminating option holders who did not have opportunity to exercise based on the exercise

16    suspension is to give them notice and opportunity to exercise after the exercise window opens.

17    Please keep Robert Turner, our head of stock administration, cc'd above, apprised of your contact

18    information so we can provide you the notice."

19          35.    By e-mail dated on or about November 15, 2007, from Whittle to Plaintiff, and

20    others, Whittle stated, "The opening of the exercise window is probably at least a few months out.

21    We will keep you posted."

22          36.    By e-mail dated on or about November 30, 2007, from Whittle to Plaintiff, and

23    others, Whittle stated, "The window to grant and exercise remains closed so we have some time on

24    this and we are still discussing internally and may have some new information to consider. I will

25    keep you posted...."

26          37.    By e-mail dated on or about January 9, 2008, from Whittle to Plaintiff, and others,

27    Whittle stated, "We still have a hold on option grants and exercises for all employees/consultants so

28    there is not much we can do on this now regardless. And we do not have a Board meeting until the

COMPLAINT

141257v2

1    end of January and all stock option decisions are made at the Board level so I do not expect to have a

2    lot of further information until possibly after that meeting."

3         38.     Despite assurances in e-mails from Whittle to Plaintiff that Whittle and Fortinet's

4    Board would give Plaintiff notice and the opportunity to exercise his stock option grants after the

5    exercise window opens, at no time prior to the filing of this Complaint has Whittle or Fortinet

6    notified Plaintiff that the exercise window has in fact opened, nor has Whittle or Fortinet given

7    Plaintiff the opportunity to exercise his stock option grants.

8         39.     By letter dated April 8, 2008, from Plaintiff's attorney to Whittle, Plaintiff's attorney

9    stated that "In the event that the exercise window has opened, Mr. Gargale tenders with this letter

10   duly-executed Fortinet, Inc., 2000 Stock Plan Exercise Notices with respect to the stock option

11   grants he possesses (specifically, Grants Numbers A-980-1, A-1082, A-1380, A-1542, A-1699, and

12   A-1768).   In compliance with the terms of the options, he is prepared to remit forthwith the

13   aggregate Exercise Price as to all Exercised Shares upon confirmation from you that the window has

14   opened and that these shares will be issued in response to Mr. Gargale's election to exercise these

15   options."   This letter forwarded to Fortinet duly-executed Exercise Notices with respect to the

16   identified stock option grants.   Plaintiff was in fact fully prepared and funded to remit forthwith the

17   aggregate Exercise Price as to all Exercised Shares upon confirmation from Fortinet that the exercise

18   window had opened and that the shares would be issued in response to Plaintiff's election to exercise

19   his options.

20        40.     Instead of advising that the exercise window had opened and instead of honoring the

21   stock option grants that Fortinet had previously provided to Plaintiff, Fortinet responded by having

22   its counsel, Terry T. Johnson, send a letter to Plaintiff's counsel dated April 18, 2008, in which

23   Fortinet's counsel stated that Fortinet had canceled all of Plaintiff's existing stock options and had

24   "declared void all Fortinet stock options granted in Mr. Gargale's name."

25   //

26   //

27   //

28   //

COMPLAINT

141257v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – DAMAGES**

**(A-0870-1 OPTION GRANT AGREEMENT)**

41.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 11 and 18 through 40 of this Complaint.

42.    On or about April 20, 2005, Plaintiff and Defendants entered into a written contract, the A-0870-1 Option Grant Agreement, attached as Exhibit C, whereby Defendants granted Plaintiff an option to purchase 7,200 shares of Fortinet's Common Stock at $1.95 per share.

43.    The stock options granted by the A-0870-1 Option Grant Agreement fully vested in Plaintiff on or before April 20, 2006.

44.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Fortinet would not perform the contract, and Defendants totally repudiated it. Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 7,200 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

45.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

46.    As a result of Defendants' breach of the contract, Plaintiff has been damaged in an amount according to proof at trial.

//

//

//

//

//

141257v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SECOND CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

**(A-0870-1 OPTION GRANT AGREEMENT)**

47.     Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 11 and 18 through 40 of this Complaint.

48.     On or about April 20, 2005, Plaintiff and Defendants entered into a written contract, the A-0870-1 Option Grant Agreement, attached as Exhibit C, whereby Defendants granted Plaintiff an option to purchase 7,200 shares of Fortinet's Common Stock at $1.95 per share.

49.     The stock options granted by the A-0870-1 Option Grant Agreement fully vested in Plaintiff on or before April 20, 2006.

50.     At the time the A-0870-1 Option Grant Agreement was entered into, the shares referred to therein were reasonably worth at least $1.95 per share, so that the agreement was fair, just and reasonable as to Defendants, and the consideration accruing to Defendants is adequate.

51.     On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Defendants would not perform the contract and totally repudiated it.  Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 7,200 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

52.     At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

53.     For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded in the market and therefore have no established market value and, accordingly, damages will be inadequate to compensate Plaintiff for the detriment suffered by him.

COMPLAINT

141257v2

1

**THIRD CAUSE OF ACTION**

2

**AGAINST ALL DEFENDANTS**

3

**FOR BREACH OF CONTRACT – DAMAGES**

4

**(A-1083 OPTION GRANT AGREEMENT)**

5       54.     Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6   through 10, 12, and 18 through 40 of this Complaint.

7       55.     On or about October 24, 2005, Plaintiff and Defendants entered into a written

8   contract, the A-1083 Option Grant Agreement, whereby Defendants granted Plaintiff an option to

9   purchase 16,666 shares of Fortinet's Common Stock at $1.95 per share.

10      56.     The stock options granted by the A-1083 Option Grant Agreement fully vested in

11  Plaintiff on or about October 24, 2005.

12      57.     On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

13  Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

14  Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to

15  fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

16  Plaintiff 16,666 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

17  Price.

18      58.     At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

19  the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

20  for those promises, covenants, and conditions excused by the acts, omissions, and representations of

21  Defendants), and was ready, able, and willing to complete performance on his part.

22      59.     As a result of Defendants' breach of the contract, Plaintiff has been damaged in an

23  amount according to proof at trial.

24  //

25  //

26  //

27  //

28  //

COMPLAINT

141257v2

1

**FOURTH CAUSE OF ACTION**

2

**AGAINST ALL DEFENDANTS**

3

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

4

**(A-1083 OPTION GRANT AGREEMENT)**

5       60.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6 through 10, 12, and 18 through 40 of this Complaint.

7       61.    On or about October 24, 2005, Plaintiff and Defendants entered into a written

8 contract, the A-1083 Option Grant Agreement, whereby Defendants granted Plaintiff an option to

9 purchase 16,666 shares of Fortinet's Common Stock at $1.95 per share.

10       62.    The stock options granted by the A-1083 Option Grant Agreement fully vested in

11 Plaintiff on or about October 24, 2005.

12       63.    At the time the A-1083 Option Grant Agreement was entered into, the shares referred

13 to therein were reasonably worth at least $1.95 per share, so that the agreement was fair, just and

14 reasonable as to Defendants and the consideration accruing to Defendants is adequate.

15       64.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

16 Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

17 Defendants' repudiation has not been retracted. Defendants have failed and refused, and continue to

18 fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

19 Plaintiff 16,666 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

20 Price.

21       65.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

22 the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

23 for those promises, covenants, and conditions excused by the acts, omissions, and representations of

24 Defendants), and was ready, able, and willing to complete performance on his part.

25       66.    For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that

26 damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded

27 in the market and therefore have no established market value and, accordingly, damages will be

28 inadequate to compensate Plaintiff for the detriment suffered by him.

COMPLAINT

141257v2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**FIFTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – DAMAGES**

**(A-1380 OPTION GRANT AGREEMENT)**

67.     Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10, 14, and 18 through 40 of this Complaint.

68.     On or about January 24, 2006, Plaintiff and Defendants entered into a written contract, the A-1380 Option Grant Agreement, attached as Exhibit F, whereby Defendants granted Plaintiff an option to purchase 33,332 shares of Fortinet's Common Stock at $1.95 per share.

69.     The stock options granted by the A-1380 Option Grant Agreement fully vested in Plaintiff on or about January 24, 2006.

70.     On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it. Defendants' repudiation has not been retracted. Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 33,332 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

71.     At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

72.     As a result of Defendants' breach of the contract, Plaintiff has been damaged in an amount according to proof at trial.

//
//
//
//
//

16

141257v2

**SIXTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

**(A-1380 OPTION GRANT AGREEMENT)**

73.     Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10, 14, and 18 through 40 of this Complaint.

74.     On or about January 24, 2006, Plaintiff and Defendants entered into a written contract, the A-1380 Option Grant Agreement, attached as Exhibit F, whereby Defendants granted Plaintiff an option to purchase 33,332 shares of Fortinet's Common Stock at $1.95 per share.

75.     The stock options granted by the A-1380 Option Grant Agreement fully vested in Plaintiff on or about January 24, 2006.

76.     At the time the A-1380 Option Grant Agreement was entered into, the shares referred to therein were reasonably worth at least $1.95 per share, so that the agreement was fair, just and reasonable as to Defendants and the consideration accruing to Defendants is adequate.

77.     On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it. Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 33,332 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

78.     At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

79.     For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded in the market and therefore have no established market value and, accordingly, damages will be inadequate to compensate Plaintiff for the detriment suffered by him.

17

COMPLAINT

141257v2

1

## SEVENTH CAUSE OF ACTION

2

## AGAINST ALL DEFENDANTS

3

## FOR BREACH OF CONTRACT – DAMAGES

4

## (A-1542 OPTION GRANT AGREEMENT)

5       80.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6    through 10, 15, and 18 through 40 of this Complaint.

7       81.    On or about July 20, 2006, Plaintiff and Defendants entered into a written contract,

8    the A-1542 Option Grant Agreement, attached as Exhibit G, whereby Defendants granted Plaintiff

9    an option to purchase 16,666 shares of Fortinet's Common Stock at $2.15 per share.

10      82.    The stock options granted by the A-1542 Option Grant Agreement fully vested in

11   Plaintiff on or about July 20, 2006.

12      83.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

13   Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

14   Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to

15   fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

16   Plaintiff 16,666 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

17   Price.

18      84.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

19   the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

20   for those promises, covenants, and conditions excused by the acts, omissions, and representations of

21   Defendants), and was ready, able, and willing to complete performance on his part.

22      85.    As a result of Defendants' breach of the contract, Plaintiff has been damaged in an

23   amount according to proof at trial.

24   //

25   //

26   //

27   //

28   //

141257v2

1

### EIGHTH CAUSE OF ACTION

2

### AGAINST ALL DEFENDANTS

3

### FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE

4

### (A-1542 OPTION GRANT AGREEMENT)

5       86.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6   through 10, 15, and 18 through 40 of this Complaint.

7       87.    On or about July 20, 2006, Plaintiff and Defendants entered into a written contract,

8   the A-1542 Option Grant Agreement, attached as Exhibit G, whereby Defendants granted Plaintiff

9   an option to purchase 16,666 shares of Fortinet's Common Stock at $2.15 per share.

10      88.    The stock options granted by the A-1542 Option Grant Agreement fully vested in

11  Plaintiff on or about July 20, 2006.

12      89.    At the time the A-1542 Option Grant Agreement was entered into, the shares referred

13  to therein were reasonably worth at least $2.15 per share, so that the agreement was fair, just and

14  reasonable as to Defendants and the consideration accruing to Defendants is adequate.

15      90.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

16  Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

17  Defendants' repudiation has not been retracted. Defendants have failed and refused, and continue to

18  fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

19  Plaintiff 16,666 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

20  Price.

21      91.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

22  the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

23  for those promises, covenants, and conditions excused by the acts, omissions, and representations of

24  Defendants), and was ready, able, and willing to complete performance on his part.

25      92.    For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that

26  damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded

27  in the market and therefore have no established market value and, accordingly, damages will be

28  inadequate to compensate Plaintiff for the detriment suffered by him.

19

COMPLAINT

141257v2

1

2

3

4

**NINTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – DAMAGES**

**(A-1699 OPTION GRANT AGREEMENT)**

5    93.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6    through 10, 16, and 18 through 40 of this Complaint.

7    94.    On or about July 20, 2006, Plaintiff and Defendants entered into a written contract,

8    the A-1699 Option Grant Agreement, attached as Exhibit H, whereby Defendants granted Plaintiff

9    an option to purchase 33,332 shares of Fortinet's Common Stock at $2.15 per share.

10    95.    The stock options granted by the A-1699 Option Grant Agreement fully vested in

11    Plaintiff on or about July 20, 2006.

12    96.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

13    Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

14    Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to

15    fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

16    Plaintiff 33,332 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

17    Price.

18    97.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

19    the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

20    for those promises, covenants, and conditions excused by the acts, omissions, and representations of

21    Defendants), and was ready, able, and willing to complete performance on his part.

22    98.    As a result of Defendants' breach of the contract, Plaintiff has been damaged in an

23    amount according to proof at trial.

24    //

25    //

26    //

27    //

28    //

141257v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TENTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

**(A-1699 OPTION GRANT AGREEMENT)**

99.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10, 16, and 18 through 40 of this Complaint.

100.    On or about July 20, 2006, Plaintiff and Defendants entered into a written contract, the A-1699 Option Grant Agreement, attached as Exhibit H, whereby Defendants granted Plaintiff an option to purchase 33,332 shares of Fortinet's Common Stock at $2.15 per share.

101.    The stock options granted by the A-1699 Option Grant Agreement fully vested in Plaintiff on or about July 20, 2006.

102.    At the time the A-1699 Option Grant Agreement was entered into, the shares referred to therein were reasonably worth at least $2.15 per share, so that the agreement was fair, just and reasonable as to Defendants and the consideration accruing to Defendants is adequate.

103.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it. Defendants' repudiation has not been retracted. Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 33,332 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

104.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

105.    For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded in the market and therefore have no established market value and, accordingly, damages will be inadequate to compensate Plaintiff for the detriment suffered by him.

COMPLAINT

141257v2

1    **ELEVENTH CAUSE OF ACTION**

2    **AGAINST ALL DEFENDANTS**

3    **FOR BREACH OF CONTRACT – DAMAGES**

4    **(A-1768 OPTION GRANT AGREEMENT)**

5         106.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

6    through 10, and 17 through 40 of this Complaint.

7         107.    On or about October 26, 2006, Plaintiff and Defendants entered into a written

8    contract, the A-1768 Option Grant Agreement, attached as Exhibit I, whereby Defendants granted

9    Plaintiff an option to purchase 14,285 shares of Fortinet's Common Stock at $2.40 per share.

10         108.    The stock options granted by the A-1768 Option Grant Agreement fully vested in

11    Plaintiff on or about October 26, 2006.

12         109.    On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to

13    Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it.

14    Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to

15    fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to

16    Plaintiff 14,285 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise

17    Price.

18         110.    At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of

19    the promises, covenants, and conditions he agreed to perform in accordance with the contract (except

20    for those promises, covenants, and conditions excused by the acts, omissions, and representations of

21    Defendants), and was ready, able, and willing to complete performance on his part.

22         111.    As a result of Defendants' breach of the contract, Plaintiff has been damaged in an

23    amount according to proof at trial.

24    //

25    //

26    //

27    //

28    //

COMPLAINT

141257v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TWELFTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

**(A-1768 OPTION GRANT AGREEMENT)**

112.   Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10 and 17 through 40 of this Complaint.

113.   On or about October 26, 2006, Plaintiff and Defendants entered into a written contract, the A-1768 Option Grant Agreement, attached as Exhibit I, whereby Defendants granted Plaintiff an option to purchase 14,285 shares of Fortinet's Common Stock at $2.40 per share.

114.   The stock options granted by the A-1768 Option Grant Agreement fully vested in Plaintiff on or about October 26, 2006.

115.   At the time the A-1768 Option Grant Agreement was entered into, the shares referred to therein were reasonably worth at least $2.40 per share, so that the agreement was fair, just and reasonable as to Defendants and the consideration accruing to Defendants is adequate.

116.   On or about April 18, 2008, Defendants, by letter to Plaintiff's counsel, gave notice to Plaintiff that Defendants would not perform the contract, and Defendants totally repudiated it. Defendants' repudiation has not been retracted.  Defendants have failed and refused, and continue to fail and refuse, to perform the conditions of the contract on their part in that they refuse to transfer to Plaintiff 14,285 shares of Common Stock in exchange for Plaintiff's payment of the Total Exercise Price.

117.   At the time Plaintiff received Defendants' repudiation, Plaintiff had performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants), and was ready, able, and willing to complete performance on his part.

118.   For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded in the market and therefore have no established market value and, accordingly, damages will be inadequate to compensate Plaintiff for the detriment suffered by him.

COMPLAINT

141257v2

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**THIRTEENTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – DAMAGES**

**(2006 BOARD OF ADVISORS APPOINTMENT AGREEMENT)**

119.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10, 13, and 18 through 40 of this Complaint.

120.    On or about January 1, 2006, Plaintiff and Defendants entered into a written contract, the 2006 Board of Advisors Appointment Agreement, attached as Exhibit E, wherein Defendants agreed to grant to Plaintiff nonstatutory stock options for shares of Fortinet's Common Stock in consideration of Plaintiff's duties and obligations described therein.

121.    Plaintiff has performed all of the promises, covenants, and conditions he agreed to perform in accordance with the contract (except for those promises, covenants, and conditions excused by the acts, omissions, and representations of Defendants)

122.    Plaintiff has requested that Defendants perform their obligations under the contract. However, within four years of the filing of this Complaint, Defendants breached the contract by failing and refusing to grant to Plaintiff nonstatutory stock options for shares of Fortinet's Common Stock.

123.    As a result of Defendants' breach of the contract, Plaintiff has been damaged in an amount according to proof at trial.

**FOURTEENTH CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR BREACH OF CONTRACT – SPECIFIC PERFORMANCE**

**(2006 BOARD OF ADVISORS APPOINTMENT AGREEMENT)**

124.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 10, 13, and 18 through 40 of this Complaint.

125.    On or about January 1, 2006, Plaintiff and Defendants entered into a written contract, the 2006 Board of Advisors Appointment Agreement, attached as Exhibit E, whereby Defendants

COMPLAINT

141257v2

1  agreed to grant to Plaintiff nonstatutory stock options for shares of Fortinet's Common Stock in

2  consideration of Plaintiff's duties and obligations described therein.

3      126.   At the time the 2006 Board of Advisors Appointment Agreement was entered into,

4  the shares referred to therein were reasonably worth at least $2.40 per share, so that the agreement

5  was fair, just and reasonable as to Defendants and the consideration accruing to Defendants is

6  adequate.

7      127.   Plaintiff has performed all of the promises, covenants, and conditions he agreed to

8  perform in accordance with the contract (except for those promises, covenants, and conditions

9  excused by the acts, omissions, and representations of Defendants).

10      128.   Plaintiff has requested that Defendants perform their obligations under the contract.

11  However, within four years of the filing of this Complaint, Defendants breached the contract by

12  failing and refusing to grant to Plaintiff nonstatutory stock options for shares of Fortinet's Common

13  Stock.

14      129.   For the reasons heretofore stated, Plaintiff has no adequate legal remedy in that

15  damages, if awarded, cannot be properly ascertained since the shares of stock are not publicly traded

16  in the market and therefore have no established market value and, accordingly, damages will be

17  inadequate to compensate Plaintiff for the detriment suffered by him.

18  **FIFTEENTH CAUSE OF ACTION**

19  **AGAINST ALL DEFENDANTS**

20  **FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH**

21  **AND FAIR DEALING**

22      130.   Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

23  through 129 of this Complaint.

24      131.   Each of the contracts between Plaintiff and Defendants include an implied covenant

25  of good faith and fair dealing between the parties.  These implied covenants impose a duty upon

26  Defendants not to do anything to deprive Plaintiff of the benefits of those contracts.

27      132.   In June of 2005, Plaintiff became a Shareholder of Fortinet through his direct

28  purchase of 20,000 shares of Fortinet Series E Preferred Stock.  At all times mentioned in this

141257v2

1    Complaint, Plaintiff has been, and is, a Shareholder of Fortinet.  Plaintiff is a signatory to Fortinet's

2    Confidential Information and Invention Assignment Agreement.  Under the 2005 Board of Advisors

3    Appointment Agreement, the 2006 Board of Advisors Appointment Agreement, and Fortinet's 2000

4    Stock Plan, Plaintiff was a Service Provider to Fortinet.  By virtue of being a Shareholder of

5    Fortinet, a member of the Fortinet Board of Advisors, a signatory to Fortinet's Confidential

6    Information and Invention Assignment Agreement, a Service Provider to Fortinet, and a fully-vested

7    Optionee under Fortinet's various Notices of Stock Option Grant, Plaintiff had at all times

8    mentioned in this Complaint a special, confidential, and fiduciary relationship with Defendants.

9         133.    Defendants breached the implied covenants by obtaining services from Plaintiff,

10    resulting in benefits to Defendants (including but not limited to revenues and sales to Defendants),

11    and then unilaterally and in bad faith voiding vested stock options belonging to Plaintiff, repudiating

12    and denying in bad faith existing contracts with Plaintiff, and unreasonably and in bad faith delaying

13    and interfering with Plaintiff's efforts to exercise his vested stock options.  Plaintiff is informed and

14    believes and thereon alleges that Defendants have further breached the duty of good faith and fair

15    dealing owed to Plaintiff by other acts and omissions of which Plaintiff is presently unaware and

16    which will be shown according to proof at the time of trial.

17         134.    The breaches of the implied covenants by Defendants have damaged Plaintiff and

18    have unjustly enriched Defendants in an amount to be proven at trial.

19    **SIXTEENTH CAUSE OF ACTION**

20    **AGAINST ALL DEFENDANTS**

21    **FOR BREACH OF FIDUCIARY DUTY**

22         135.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

23    through 134 of this Complaint.

24         136.    By virtue of being a Shareholder of Fortinet, a member of the Fortinet Board of

25    Advisors, a signatory to Fortinet's Confidential Information and Invention Assignment Agreement, a

26    Service Provider to Fortinet, and an Optionee under Fortinet's various Notices of Stock Option

27    Grant, Defendants maintained positions of trust and confidence with Plaintiff.

28

26

COMPLAINT

141257v2

1    137.    Defendants used their positions of trust and confidence to further their own interests

2    and to harm the interests of Plaintiff, and they breached their fiduciary duties to Plaintiff by

3    engaging in the acts alleged herein.

4    138.    As a direct, proximate, and legal result of Defendants' breach of their fiduciary

5    duties, Plaintiff has suffered injury and harm in an amount to be proven at the time of trial.

6    139.    The aforementioned acts of Defendants were willful and malicious and justify an

7    award of punitive damages in an amount sufficient to punish said parties and to deter future conduct

8    of this type.

9    **SEVENTEENTH CAUSE OF ACTION**

10    **AGAINST ALL DEFENDANTS**

11    **FOR CONVERSION**

12    140.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

13    through 40 of this Complaint.

14    141.    On or about February 7, 2008, Plaintiff was, and still is, the owner and was, and still

15    is, entitled to the dominion, possession and ownership of personal property, to wit, various stock

16    options granted to Plaintiff by Defendants and the shares of Fortinet represented by such stock

17    options.

18    142.    On or about February 7, 2008, Defendants took the property described above from

19    Plaintiff's possession, dominion, and ownership and converted the same to their own use.  On or

20    about February 7, 2008, Defendants assumed control and ownership over the property described

21    above, and wrongfully exerted dominion over such property in denial of and inconsistent with

22    Plaintiff's rights therein, and converted the same to their own use.

23    143.    As a proximate result of Defendants' conversion, Plaintiff has suffered damages

24    consisting of the value of the property described above, in an amount to be proven at the time of

25    trial.

26    144.    As a natural, reasonable, and proximate result of Defendants' conversion, Plaintiff

27    has further suffered damages, in an amount to be proven at the time of trial, by being deprived of the

28    investment benefits of ownership of the property described above.

27

COMPLAINT

141257v2

146.    Subsequent to the time of Defendants' conversion of the property described above, Plaintiff has properly expended time and money in pursuit of the property, and is therefore entitled to an award of fair compensation in an amount to be proven at the time of trial.

147.    The aforementioned acts of Defendants were willful, malicious, and fraudulent and justify an award of punitive damages in an amount sufficient to punish said parties and to deter future conduct of this type.

## EIGHTEENTH CAUSE OF ACTION

## AGAINST ALL DEFENDANTS

## FOR FRAUD

148.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1 through 40 of this Complaint.

149.    Plaintiff is informed and believes and thereon alleges that Whittle and Nelson, who made the representations herein alleged, are Vice Presidents of Defendants and, at the time of the making of the representations herein alleged and at all times herein mentioned, were acting within the course and scope of their employment and authority for Defendants.

150.    Beginning on or about February 12, 2007, Whittle, Nelson, and Defendants made the following representations, among others, to Plaintiff:

a.    That Fortinet "will provide [Plaintiff] with an extension on the window to exercise" [the vested stock options]. (Representation made by Nelson with a cc by e-mail to Whittle.)

b.    "Todd [Nelson] is putting together a draft amendment that should address your concerns and, as soon as the draft is ready, we will send it to you." (Representation made by Whittle, with a cc by e-mail to Nelson).

c.    "[W]e will address this with an amendment." (Representation made by Whittle, with a cc by e-mail to Nelson).

d.    "I'm working on the draft agreement to formalize the agreement to your consulting agreement for the extension/transition period." (Representation made by Nelson, with a cc by e-mail to Whittle.)

28

COMPLAINT

141257v2

1   e. The "exercise window is still closed." (Representation made by Whittle, also

2 sent by e-mail to Nelson.)

3   f. "I am writing to confirm that the current intent of the Fortinet Board for

4 terminating option holders who did not have opportunity to exercise based on the exercise

5 suspension is to give them notice and opportunity to exercise after the exercise window opens."

6 (Representation made by Whittle, with a cc by e-mail to Robert Turner at Fortinet.)

7   g. "The window to grant and exercise remains closed." (Representation made by

8 Whittle, with a cc by e-mail to Nelson.)

9   h. "We still have a hold on option grants and exercises for all

10 employees/consultants so there is not much we can do on this now regardless." (Representation

11 made by Whittle, with a cc by e-mail to Nelson.)

12   151. Plaintiff is informed and believes and thereon alleges that the representations made by

13 Whittle, Nelson, and Defendants were in fact false.

14   152. Plaintiff is informed and believes and thereon alleges that when Whittle, Nelson, and

15 Defendants made these representations, they knew them to be false and made these representations

16 with the intention to deceive and defraud Plaintiff and to induce Plaintiff to act in reliance on these

17 representations in the manner hereafter alleged, or with the expectation that Plaintiff would so act.

18   153. At the time these representations were made by Whittle, Nelson, and Defendants, and

19 at the time Plaintiff took the actions herein alleged, Plaintiff was ignorant of the falsity of these

20 representations and believed them to be true.  In reliance on these representations, Plaintiff was

21 induced to and did fail to fully and completely exercise his existing and vested stock options and was

22 induced to and did delay in his claim for and recovery of additional stock options under the 2006

23 Advisors Appointment Agreement, all to his detriment and damage and by reason of which Plaintiff

24 has been damaged in amount to be proven at the time of trial.

25   154. Plaintiff is informed and believes and thereon alleges that Defendants and its officers,

26 directors, and managing agents authorized and ratified the aforementioned wrongful conduct of

27 Whittle and Nelson, and others.

28

141257v2

1    155.    Plaintiff is informed and believes and thereon alleges that the aforementioned conduct

2    of Defendants consisted of intentional misrepresentations, deceits, and concealments of material

3    facts known to Defendants and were made with the intention on the part of Defendants of thereby

4    depriving Plaintiff of property and legal rights and otherwise causing injury, and were willful,

5    malicious, and fraudulent and therefore justify an award of punitive damages in an amount sufficient

6    to punish said parties and to deter future conduct of this type.

7    ## NINETEENTH CAUSE OF ACTION

8    ## AGAINST ALL DEFENDANTS

9    ## FOR NEGLIGENT MISREPRESENTATION

10   156.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

11   through 40 of this Complaint.

12   157.    Plaintiff is informed and believes and thereon alleges that Whittle and Nelson, who

13   made the representations herein alleged, are Vice Presidents of Defendants and, at the time of the

14   making of the representations herein alleged and at all times herein mentioned, were acting within

15   the course and scope of their employment and authority for Defendants.

16   158.    Beginning on or about February 12, 2007, Whittle, Nelson, and Defendants made the

17   following representations, among others, to Plaintiff:

18   a.    That Fortinet "will provide [Plaintiff] with an extension on the window to

19   exercise" [the vested stock options].   (Representation made by Nelson with a cc by e-mail to

20   Whittle.)

21   b.    "Todd [Nelson] is putting together a draft amendment that should address

22   your concerns and, as soon as the draft is ready, we will send it to you." (Representation made by

23   Whittle, with a cc by e-mail to Nelson.)

24   c.    "[W]e will address this with an amendment."   (Representation made by

25   Whittle, with a cc by e-mail to Nelson.)

26   d.    "I'm working on the draft agreement to formalize the agreement to your

27   consulting agreement for the extension/transition period." (Representation made by Nelson, with a

28   cc by e-mail to Whittle.)

COMPLAINT

141257v2

1        e.     The "exercise window is still closed." (Representation made by Whittle, also

2  sent by e-mail to Nelson.)

3        f.     "I am writing to confirm that the current intent of the Fortinet Board for

4  terminating option holders who did not have opportunity to exercise based on the exercise

5  suspension is to give them notice and opportunity to exercise after the exercise window opens."

6  (Representation made by Whittle, with a cc by e-mail to Robert Turner at Fortinet.)

7        g.     "The window to grant and exercise remains closed." (Representation made by

8  Whittle, with a cc by e-mail to Nelson.)

9        h.     "We still have a hold on option grants and exercises for all

10  employees/consultants so there is not much we can do on this now regardless." (Representation

11  made by Whittle, with a cc by e-mail to Nelson.)

12      159.    Plaintiff is informed and believes and thereon alleges that the representations made by

13  Whittle, Nelson, and Defendants were in fact false.

14      160.    Plaintiff is informed and believes and thereon alleges that when Whittle, Nelson, and

15  Defendants made these representations, they had no reasonable ground for believing that the

16  representations were true, and Whittle, Nelson, and Defendants made the representations with the

17  intent to induce Plaintiff to act in reliance on these representations in the manner hereafter alleged,

18  or with the expectation that Plaintiff would so act, and with the intent to prevent Plaintiff from fully

19  and completely exercising his existing and vested stock options and from asserting and recovering

20  his claims for additional stock options under the 2006 Advisors Appointment Agreement.

21      161.    At the time these representations were made by Whittle, Nelson, and Defendants, and

22  at the time Plaintiff took the actions herein alleged, Plaintiff was ignorant of the falsity of these

23  representations and believed them to be true. In reliance on these representations, Plaintiff was

24  induced to and did fail to fully and completely exercise his existing and vested stock options and was

25  induced to and did delay in his claim for and recovery of additional stock options under the 2006

26  Advisors Appointment Agreement, all to his detriment and damage and by reason of which Plaintiff

27  has been damaged in amount to be proven at the time of trial.

28

COMPLAINT

141257v2

1    162.    Plaintiff is informed and believes and thereon alleges that Defendants and its officers,

2    directors, and managing agents authorized and ratified the aforementioned wrongful conduct of

3    Whittle and Nelson, and others.

### TWENTIETH CAUSE OF ACTION

### AGAINST ALL DEFENDANTS

### FOR CONSTRUCTIVE FRAUD

7    163.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

8    through 40 of this Complaint.

9    164.    In June of 2005, Plaintiff became a Shareholder of Fortinet through his direct

10   purchase of 20,000 shares of Fortinet Series E Preferred Stock. At all times mentioned in this

11   Complaint, Plaintiff has been, and is, a Shareholder of Fortinet. Plaintiff is a signatory to Fortinet's

12   Confidential Information and Invention Assignment Agreement. Under the 2005 Board of Advisors

13   Appointment Agreement, the 2006 Board of Advisors Appointment Agreement, and Fortinet's 2000

14   Stock Plan, Plaintiff was a Service Provider to Fortinet. By virtue of being a Shareholder of

15   Fortinet, a member of the Fortinet Board of Advisors, a signatory to Fortinet's Confidential

16   Information and Invention Assignment Agreement, a Service Provider to Fortinet, and a fully-vested

17   Optionee under Fortinet's various Notices of Stock Option Grant, Plaintiff had at all times

18   mentioned in this Complaint a confidential and fiduciary relationship with Defendants.

19   165.    Plaintiff is informed and believes and thereon alleges that Whittle and Nelson, who

20   made the representations and material misstatements, and who failed to disclose facts, as herein

21   alleged, are Vice Presidents of Defendants and, at the time of the making of the representations and

22   material misstatements herein alleged and at all times herein mentioned, were acting within the

23   course and scope of their employment and authority for Defendants.

24   166.    Beginning on or about February 12, 2007, Whittle, Nelson and Defendants failed to

25   disclose facts to Plaintiff and made the following representations and material misstatements, among

26   others, to Plaintiff:

27

28

141257v2

1          a.      That Fortinet "will provide [Plaintiff] with an extension on the window to

2     exercise" [the vested stock options].  (Representation made by Nelson with a cc by e-mail to

3     Whittle.)

4          b.      "Todd [Nelson] is putting together a draft amendment that should address

5     your concerns and, as soon as the draft is ready, we will send it to you."  (Representation made by

6     Whittle, with a cc by e-mail to Nelson.)

7          c.      "[W]e will address this with an amendment."  (Representation made by

8     Whittle, with a cc by e-mail to Nelson.)

9          d.      "I'm working on the draft agreement to formalize the agreement to your

10    consulting agreement for the extension/transition period."  (Representation made by Nelson, with a

11    cc by e-mail to Whittle.)

12         e.      The "exercise window is still closed."  (Representation made by Whittle, also

13    sent by e-mail to Nelson.)

14         f.      "I am writing to confirm that the current intent of the Fortinet Board for

15    terminating option holders who did not have opportunity to exercise based on the exercise

16    suspension is to give them notice and opportunity to exercise after the exercise window opens."

17    (Representation made by Whittle, with a cc by e-mail to Robert Turner at Fortinet.)

18         g.      "The window to grant and exercise remains closed."  (Representation made by

19    Whittle, with a cc by e-mail to Nelson.)

20         h.      "We  still  have  a  hold  on  option  grants  and  exercises  for  all

21    employees/consultants so there is not much we can do on this now regardless."  (Representation

22    made by Whittle, with a cc by e-mail to Nelson.)

23         167.    Plaintiff is informed and believes and thereon alleges that the representations made by

24    Whittle, Nelson, and Defendants were in fact false.

25         168.    At the time these representations, material misstatements, and failures to disclose

26    facts were made by Whittle, Nelson, and Defendants, and at the time Plaintiff took the actions herein

27    alleged, Plaintiff was ignorant of the falsity of these representations and material misstatements and

28    believed them to be true.  In reliance on these representations and material misstatements, Plaintiff

                                        33
141257v2

1   was induced to and did fail to fully and completely exercise his existing and vested stock options and

2   was induced to and did delay in his claim for and recovery of additional stock options under the

3   2006 Advisors Appointment Agreement, all to his detriment and damage and by reason of which

4   Plaintiff has been damaged in amount to be proven at the time of trial.

5       169.    Plaintiff is informed and believes and thereon alleges that Defendants and its officers,

6   directors, and managing agents authorized and ratified the aforementioned wrongful conduct of

7   Whittle and Nelson, and others.

8       170.    Plaintiff is informed and believes and thereon alleges that the aforementioned conduct

9   of Defendants consisted of intentional misrepresentations, material misstatements, deceits, and

10  concealments of material facts known to Defendants and were made with the intention on the part of

11  Defendants of thereby depriving Plaintiff of property and legal rights and otherwise causing injury,

12  and were willful, malicious, and fraudulent and therefore justify an award of punitive damages in an

13  amount sufficient to punish said parties and to deter future conduct of this type.

**TWENTY-FIRST CAUSE OF ACTION**

**AGAINST ALL DEFENDANTS**

**FOR UNFAIR BUSINESS PRACTICES**

**[CAL. B. & P. CODE §§17200, et seq.]**

18      171.    Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

19  through 170 of this Complaint.

20      172.    Defendants' actions and conduct, as complained herein, constitute unlawful, unfair,

21  and fraudulent business practices committed in violation of the California Unfair Competition Law

22  (Sections 17200 et seq., of the California Business & Profession Code).

23      173.    Plaintiff has suffered an injury in fact and has lost money and property as a result of

24  the unlawful, unfair, and fraudulent business practices committed by Defendants, in that Plaintiff has

25  been deprived of fully-vested property and benefits by Defendants and in that Defendants have

26  obtained the benefits of Plaintiff's services while denying and refusing to honor their contractual

27  and fiduciary obligations.

28

34

COMPLAINT

141257v2

1    174.   Plaintiff requests that this Court enter such orders and judgments as may be necessary

2    to restore to Plaintiff any money and property which may have been acquired by means of such

3    unlawful, unfair and fraudulent practices, as provided in Section 17203 of the California Business &

4    Professions Code, and for such other relief as set forth below.

5    175.   Plaintiff requests that this Court issue a permanent injunction enjoining Defendants

6    and their agents, employees, servants, and all persons acting under or in concert with them, from

7    depriving Plaintiff of fully-vested property and benefits and requiring Defendants and their agents,

8    employees, servants, and all persons acting under or in concert with them, to honor and comply with

9    their contractual and fiduciary obligations.

10    176.   Plaintiff seeks an award from this Court of restitution, injunctive relief, and all other

11    relief allowed under Sections 17200, et seq., of the California Business & Professions Code, in

12    addition to interest, costs, and attorneys' fees as permitted under Section 1021.5 of the California

13    Civil Code.

14    ## TWENTY-SECOND CAUSE OF ACTION

15    ## AGAINST ALL DEFENDANTS

16    ## FOR QUANTUM VALEBANT/QUANTUM MERUIT

17    177.   Plaintiff incorporates by this reference, as though fully set forth herein, paragraphs 1

18    through 176 of this Complaint.

19    178.   Beginning on or about March 1, 2005, and continuing through December 31, 2006,

20    Defendants requested Plaintiff to provide certain services and expertise, including (without

21    limitation) technical and market advice, periodic meetings with key Fortinet executives and staff to

22    discuss technical and market issues related to the network security market in general and Fortinet's

23    offerings in particular, introducing Fortinet representatives to potential end-user customers and

24    partners, ongoing assistance in the interest of promoting Fortinet's products and brand, and

25    assistance in the growth and success of Fortinet.

26    179.   Plaintiff provided Defendants with services and benefits with the expectation that

27    Defendants would compensate Plaintiff with the issuance of exercisable stock options as herein

28    alleged.

35

COMPLAINT

141257v2

180.    Beginning on or about January 1, 2007, and continuing to the present, Defendants have voided Plaintiff's fully-vested stock options, have deprived Plaintiff of the opportunity to exercise such fully-vested stock options, and have failed and refuse to issue to Plaintiff additional stock option grants based on the achievement of performance milestones, while at the same time obtaining all the benefits, sales, promotions, increased market share, improved brand, improved growth, and improved success as a result of the services and benefits provided by Plaintiff.

181.    As a direct, legal and proximate result of Defendants' failure and refusal to compensate Plaintiff for the services and benefits he has provided, Plaintiff is entitled to damages in the amount, to be proven at the time of trial, of the reasonable value of such services, including the consequential value of such services to Defendants as a result of increasing and improving Defendants' market share, brand, growth, and success.

## REQUEST FOR JURY TRIAL

Plaintiff hereby requests a trial by jury on all matters.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays for judgment against Defendants, and each of them, as follows:

1.    As to the First Cause of Action, for a judgment for money damages;

2.    As to the Second Cause of Action, that Defendants be ordered to deliver and convey to Plaintiff 7,200 shares of Fortinet's Common Stock at $1.95 per share within 15 days of the entry of judgment herein, as specific performance of the A-0870-1 Option Grant Agreement, upon full and complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

4.    As to the Third Cause of Action, for a judgment for money damages;

5.    As to the Fourth Cause of Action, that Defendants be ordered to deliver and convey to Plaintiff 16,666 shares of Fortinet's Common Stock at $1.95 per share within 15 days of the entry of judgment herein, as specific performance of the A-1083 Option Grant Agreement, upon full and complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

6.    As to the Fifth Cause of Action, for a judgment for money damages;

COMPLAINT

141257v2

1    7.    As to the Sixth Cause of Action, that Defendants be ordered to deliver and convey to

2    Plaintiff 33,332 shares of Fortinet's Common Stock at $1.95 per share within 15 days of the entry of

3    judgment herein, as specific performance of the A-1380 Option Grant Agreement, upon full and

4    complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

5    8.    As to the Seventh Cause of Action, for a judgment for money damages;

6    9.    As to the Eighth Cause of Action, that Defendants be ordered to deliver and convey to

7    Plaintiff 16,666 shares of Fortinet's Common Stock at $2.15 per share within 15 days of the entry of

8    judgment herein, as specific performance of the A-1542 Option Grant Agreement, upon full and

9    complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

10    10.    As to the Ninth Cause of Action, for a judgment for money damages;

11    11.    As to the Tenth Cause of Action, that Defendants be ordered to deliver and convey to

12    Plaintiff 33,332 shares of Fortinet's Common Stock at $2.15 per share within 15 days of the entry of

13    judgment herein, as specific performance of the A-1699 Option Grant Agreement, upon full and

14    complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

15    12.    As to the Eleventh Cause of Action, for a judgment for money damages;

16    13.    As to the Twelfth Cause of Action, that Defendants be ordered to deliver and convey

17    to Plaintiff 14,285 shares of Fortinet's Common Stock at $2.40 per share within 15 days of the entry

18    of judgment herein, as specific performance of the A-1768 Option Grant Agreement, upon full and

19    complete payment by Plaintiff of the Total Exercise Price set forth in such Agreement;

20    14.    As to the Thirteenth Cause of Action, for a judgment for money damages;

21    15.    As to the Fourteenth Cause of Action, that Defendants be ordered to deliver and

22    convey to Plaintiff, within 15 days of the entry of judgment herein, as specific performance of the

23    2006 Advisors Appointment Agreement:

24    a.    A nonstatutory fully-vested stock option for 600 shares of Fortinet's Common

25    Stock, with an exercise price equal to fair market value of the covered shares as of January 1, 2006,

26    with a term of 10 years; and

27    b.    Additional objective-based nonstatutory full-vested stock options for shares of

28    Fortinet's Common Stock, with an exercise price equal to fair market value of the covered shares as

141257v2

1    of March 31, 2007, with a term of 10 years, based solely on POS reported revenue to Fortinet from

2    Telecom Italia during 2006;

3        16.     As to the Fifteenth Cause of Action, for a judgment for money damages;

4        17.     As to the Sixteenth Cause of Action, for a judgment for money damages and for a

5    judgment for punitive damages;

6        18.     As to the Seventeenth Cause of Action, for a judgment for money damages, for a

7    judgment for compensation for time and money expended in pursuit of the converted property, and

8    for a judgment for punitive damages;

9        19.     As to the Eighteenth Cause of Action, for a judgment for money damages and for a

10    judgment for punitive damages;

11        20.     As to the Nineteenth Cause of Action, for a judgment for money damages.

12        21.     As to the Twentieth Cause of Action, for a judgment for money damages and for a

13    judgment for punitive damages;

14        22.     As to the Twenty-first Cause of Action, for a judgment for restitution and

15    disgorgement and for a permanent injunction enjoining Defendants and their agents, employees,

16    servants, and all persons acting under or in concert with them, from depriving Plaintiff of fully-

17    vested property and benefits and requiring Defendants and their agents, employees, servants, and all

18    persons acting under or in concert with them, to honor and comply with their contractual and

19    fiduciary obligations;

20        23.     As to the Twenty-second Cause of Action, for a judgment for money damages;

21        24.     As to all Causes of Action, for costs of suit, including reasonable attorneys' fees;

22        25.     As to all Causes of Action, for pre-judgment interest;

23        26.     As to all Causes of Action, for such other and further relief as the Court deems just

24    and proper.

25    DATED:  July 1, 2008                      SHOOK, HARDY & BACON L.L.P.

26

27                                    By:_____

                                    MICHAEL C. OSBORNE

28                                     Attorneys for Plaintiff

141257v2

# FORTINET

## FORTINET BOARD OF ADVISORS APPOINTMENT AGREEMENT

This Board of Advisors appointment agreement (the "Agreement") is made and entered into as of March 1, 2005 (the "Effective Date") between Fortinet, Inc. ("Fortinet") and Avv. Enrico Gargale ("Advisor"), who is appointed hereunder to the Fortinet Board of Advisors (the "BOA").

1.      Appointment; Duties.  In consideration of the compensation and duties described herein, and pursuant to the terms and conditions contained herein, Advisor is hereby appointed to the BOA for the term set forth below (the "Appointment").  Advisor shall provide certain services and expertise as agreed to by the parties from time to time, including (without limitation) the following: technical and market advice, periodic meetings with key Fortinet executives and staff to discuss technical and market issues related to the network security market in general and Fortinet's offerings in particular, introducing Fortinet representatives to potential end-user customers and partners, and ongoing assistance as may be practical in the interest of promoting Fortinet's products and brand.  Advisor shall at all times acting hereunder endeavor to assist in the growth and success of Fortinet, and shall undertake no efforts that are likely to negatively impact Fortinet, its products, goodwill or reputation.  The Appointment shall not take effect unless and until Advisor has executed a Fortinet non-disclosure agreement.

2.      Term.  Advisor shall serve in the aforementioned role for an initial period of one (1) year from the Effective Date (the "Initial Term"), which Initial Term may be extended for subsequent terms by mutual agreement of the parties.

3.      Compensation.  In consideration of the duties and obligations described herein, Advisor shall receive the following:

   3.1.    Six hundred (600) shares of Fortinet common stock vested monthly in equal increments subject to Advisor's continuing service to Fortinet.  Said stock option grant shall be subject to the terms and according to the conditions of Fortinet's stock option plan(s) as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

   3.2.    Free use of a FortiGate Antivirus Firewall at Advisor's designated location and as approved by Fortinet.

   3.3.    Additional objective-based stock options that are based solely on POS reported revenue to Fortinet from Telecom Italia during 2005.  Advisor shall receive shares of Fortinet common stock vested monthly pursuant to the following chart and subject to Advisor's continuing service to Fortinet.  Said stock option grant shall be subject to the terms and according to the conditions of Fortinet's stock option plan(s) as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

| 2005 POS Reported Revenue From Telecom Italia | Stock Options Provided By Fortinet, Vesting Monthly |
| --- | --- |
| Above US$2,000,000.00 | 16,666 |
| Above US$4,000,000.00 | Additional 16,666 |
| Above US$5,000,000.00 | Additional 16,666 |
| Above US$6,000,000.00 | Additional 16,666 |
| Above US$7,000,000.00 | Additional 16,666 |
| Above US$8,000,000.00 | Additional 16,666 |

4.      Termination of Agreement; Effects.  This Agreement may be terminated by either party at any time and for any reason upon three (3) days notice to the other party.  Termination of this Agreement shall not absolve Advisor of his/her obligation to keep confidential any Fortinet proprietary information to which Advisor may have had access.



*Confidential*                                          1

# FORTINET

## FORTINET BOARD OF ADVISORS APPOINTMENT AGREEMENT

This Board of Advisors appointment agreement (the "Agreement") is made and entered into as of March 1, 2005 (the "Effective Date") between **Fortinet, Inc.** ("Fortinet") and **Avv. Enrico Gargale** ("Advisor"), who is appointed hereunder to the Fortinet Board of Advisors (the "BOA").

1.    <u>Appointment; Duties</u>. In consideration of the compensation and duties described herein, and pursuant to the terms and conditions contained herein, Advisor is hereby appointed to the BOA for the term set forth below (the "Appointment"). Advisor shall provide certain services and expertise as agreed to by the parties from time to time, including (without limitation) the following: technical and market advice, periodic meetings with key Fortinet executives and staff to discuss technical and market issues related to the network security market in general and Fortinet's offerings in particular, introducing Fortinet representatives to potential end-user customers and partners, and ongoing assistance as may be practical in the interest of promoting Fortinet's products and brand. Advisor shall at all times acting hereunder endeavor to assist in the growth and success of Fortinet, and shall undertake no efforts that are likely to negatively impact Fortinet, its products, goodwill or reputation. The Appointment shall not take effect unless and until Advisor has executed a Fortinet non-disclosure agreement.

2.    <u>Term</u>. Advisor shall serve in the aforementioned role for an initial period of one (1) year from the Effective Date (the "Initial Term"), which Initial Term may be extended for subsequent terms by mutual agreement of the parties.

3.    <u>Compensation</u>. In consideration of the duties and obligations described herein, Advisor shall receive the following:

      3.1.    Six hundred (600) shares of Fortinet common stock vested monthly in equal increments subject to Advisor's continuing service to Fortinet. Said stock option grant shall be subject to the terms and according to the conditions of Fortinet's stock option plan(s) as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

      3.2.    Free use of a FortiGate Antivirus Firewall at Advisor's designated location and as approved by Fortinet.

      3.3.    Additional objective-based stock options that are based solely on POS reported revenue to Fortinet from Telecom Italia during 2005. Advisor shall receive shares of Fortinet common stock vested monthly pursuant to the following chart and subject to Advisor's continuing service to Fortinet. Said stock option grant shall be subject to the terms and according to the conditions of Fortinet's stock option plan(s) as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

| 2005 POS Reported Revenue From Telecom Italia | Stock Options Provided By Fortinet, Vesting Monthly |
|---|---|
| Above US$2,000,000.00 | 16,666 |
| Above US$4,000,000.00 | Additional 16,666 |
| Above US$5,000,000.00 | Additional 16,666 |
| Above US$6,000,000.00 | Additional 16,666 |
| Above US$7,000,000.00 | Additional 16,666 |
| Above US$8,000,000.00 | Additional 16,666 |

4.    <u>Termination of Agreement; Effects</u>. This Agreement may be terminated by either party at any time and for any reason upon three (3) days notice to the other party. Termination of this Agreement shall not absolve Advisor of his/her obligation to keep confidential any Fortinet proprietary information to which Advisor may have had access.



5.    Additional Terms.  The parties acknowledge the potential existence of one or more agreements into which they may have entered, including without limitation offer letters, employment agreements, non-disclosure agreements and/or stipulations to arbitrate executed by the parties, and hereby expressly incorporate such agreements herein by reference.  To the extent permissible by law all such agreements are to be interpreted consistently with this Agreement; in the event and to the extent any term of this Agreement or this Agreement itself is contradicted or supplemented by a term or terms in another such agreement, the term(s) of the latter shall control.  This Agreement shall be governed by the laws of the State of California, as applied to agreements entered into and to be performed entirely within California between California residents, without regard to the principles of conflict of laws. Any controversies or claims arising from or relating to this Agreement, or the breach or validity thereof, which cannot be amicably settled by and between the parties, shall be referred to and finally settled by arbitration. The place of arbitration shall be Santa Clara, California, pursuant to the Streamlined Arbitration Rules and Procedures of Judicial Arbitration and Mediation Services (JAMS), or its successor, before a sole, mutually agreeable arbitrator.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

**FORTINET, INC.**

By: _____

_____
KEN XIE
Its: ___President & CFO___
              print name

Address:    920 Stewart Drive,
            Sunnyvale, CA 94087
Telephone:  (408) 235-7700
Facsimile:  (408) 235-7737

**ADVISOR**

By: _____

_____
ENRICO GARGALE
                      print name

Email: enrico.gargale@nrglex.it
Address: Via Monte di Pietà, 1
         20121 Milan Italy
Telephone: +39 (02) 862475
Facsimile: +39 (02) 867426

*Confidential*

# FORTINET, INC.

## 2000 STOCK PLAN

### STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option Agreement.

**I.** **NOTICE OF STOCK OPTION GRANT.**

Name:    ENRICO GARGALE

Address:    VIA MONTE DI PIETA, 1, MILAN 20121

Country:    ITALY

You have been granted an option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Grant Number:  A-870

Date of Grant:  APRIL 20, 2005

Vesting Commencement Date: MARCH 1, 2005

Exercise Price per share: $1.95

Total Number of Shares Granted:  7,200

Total Exercise Price:  $ 14,040.00

Type of Option:                    _____ Incentive Stock Option

                                   __X__ Nonstatutory Stock Option

Term/Expiration Date:  APRIL 20, 2015

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule:

1/12 of the Shares subject to the Option shall vest on the last day of each full calendar month following the Optionee's vesting commencement date, subject to Optionee's continuing to be a Service Provider on such dates.

Termination Period.

This Option may be exercised, to the extent it is then vested, for three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

I.    **AGREEMENT.**

    A.    **Grant of Option.**

The Plan Administrator of the Company hereby grants to the Optionee named in the Notice of Grant (the "Optionee") an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO").

    B.    **Exercise of Option.**

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

        1.    **Right to Exercise.**

(i)    Subject to subsections II.B.1.(ii) and II.B.1.(iii) below, this Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. Alternatively, at the election of the Optionee, this option may be exercised in whole or in part at any time as to Shares which have not yet vested. For purposes of this Stock Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Company. Vested Shares shall not be subject to the Company's repurchase right (as set forth in the Restricted Stock Purchase Agreement, attached hereto as Exhibit C-1).

(i)    As a condition to exercising this Option for unvested Shares, the Optionee shall execute the Restricted Stock Purchase Agreement.

(ii)    This Option may not be exercised for a fraction of a Share.

2.    **Method of Exercise.**

This Option shall be exercisable by delivery of an exercise notice in the form attached as Exhibit A (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with Applicable Laws. Assuming such compliance, for income tax purposes, the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

C.    **Optionee's Representations.**

In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B, and shall read the applicable rules of the Commissioner of Corporations attached to such Investment Representation Statement.

D.    **Lock-Up Period.**

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

E.    **Method of Payment.**

Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)    cash;

(a)    check;

(b)     consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(c)     surrender of other Shares which: (i) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

(d)     any other method authorized by the Plan, so long as the Company agrees.

**F.     Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

**G.     Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

**H.     Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

**I.     Tax Consequences.**

Set forth below is a brief summary as of the date of this Option of some of the federal tax consequences of exercise of this Option and disposition of the Shares. THIS SUMMARY IS NECESSARILY INCOMPLETE, AND THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. THE OPTIONEE SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THIS OPTION OR DISPOSING OF THE SHARES.

**1.     Exercise of ISO.**

If this Option qualifies as an ISO, there will be no regular federal income tax liability upon the exercise of the Option, although the excess, if any, of the Fair Market Value of the Shares on the date of exercise over the Exercise Price will be treated as an item of adjustment to the alternative minimum taxable income for federal tax purposes and may subject the Optionee to the alternative minimum tax in the year of exercise.

**2.    Exercise of ISO Following Disability or Death.**

If the Optionee ceases to be an Employee as a result of a disability that is not a total and permanent disability as defined in Section 22(e)(3) of the Code, to the extent permitted on the date of termination, the Optionee must exercise an ISO within three months of such termination for the ISO to be qualified as an ISO.

**3.    Exercise of Nonstatutory Stock Option.**

There may be a regular federal income tax liability upon the exercise of a Nonstatutory Stock Option. The Optionee will be treated as having received compensation income (taxable at ordinary income tax rates) equal to the excess, if any, of the Fair Market Value of the Shares on the date of exercise over the Exercise Price. If Optionee is an Employee or a former Employee, the Company will be required to withhold from Optionee's compensation or collect from Optionee and pay to the applicable taxing authorities an amount in cash equal to a percentage of this compensation income at the time of exercise, and may refuse to honor the exercise and refuse to deliver Shares if such withholding amounts are not delivered at the time of exercise.

**4.    Disposition of Shares.**

In the case of an NSO, if Shares are held for at least one year, any gain realized on disposition of the Shares will be treated as long-term capital gain for federal income tax purposes. In the case of an ISO, if Shares transferred pursuant to the Option are held for at least one year after exercise and at least two years after the Date of Grant, any gain realized on disposition of the Shares will also be treated as long-term capital gain for federal income tax purposes. If Shares purchased under an ISO are disposed of within one year after exercise or two years after the Date of Grant, any gain realized on such disposition will be treated as compensation income (taxable at ordinary income rates) to the extent of the difference between the Exercise Price and the lesser of (i) the Fair Market Value of the Shares on the date of exercise, or (ii) the sale price of the Shares. Different rules may apply if the Shares are subject to a substantial risk of forfeiture (within the meaning of Section 83) at the time of exercise. Any additional gain will be taxed as capital gain, either at short-term or long-term, depending on the period that the ISO Shares were held.

**5.    Notice of Disqualifying Disposition of ISO Shares.**

If the Option granted to Optionee herein is an ISO, and if the Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two years after the Date of Grant, or (ii) the date one year after the date of exercise, the Optionee shall immediately notify the Company in writing of such disposition. Optionee agrees that Optionee may be subject to income tax withholding by the Company on the compensation income recognized by the Optionee.

6.    **Section 83(b) Election for Unvested Shares Purchased to Options.**

With respect to the exercise of an Option for unvested Shares, an election may be filed by the Optionee with the Internal Revenue Service, <u>within 30 days</u> of the purchase of the Shares, electing pursuant to Section 83(b) of the Code to be taxed currently on any difference between the purchase price of the Shares and their Fair Market Value on the date of purchase. In the case of a Nonstatutory Stock Option, this will result in a recognition of taxable income to the Optionee on the date of exercise, measured by the excess, if any, of the fair market value of the Shares, at the time the Option is exercised over the purchase price for the Shares. Absent such an election, taxable income will be measured and recognized by Optionee at the time or times on which the Company's Repurchase Option lapses. In the case of an Incentive Stock Option, such an election will result in a recognition of income to the Optionee for alternative minimum tax purposes on the date of exercise, measured by the excess, if any, of the fair market value of the Shares, at the time the option is exercised, over the purchase price for the Shares. Absent such an election, alternative minimum taxable income will be measured and recognized by Optionee at the time or times on which the Company's Repurchase Option lapses. Optionee is strongly encouraged to seek the advice of his or her own tax consultants in connection with the purchase of the Shares and the advisability of filing of the Election under Section 83(b) of the Code. A form of Election under Section 83(b) is attached hereto as <u>Exhibit C-5</u> for reference.

OPTIONEE ACKNOWLEDGES THAT IT IS OPTIONEE'S SOLE RESPONSIBILITY AND NOT THE COMPANY'S TO FILE TIMELY THE ELECTION UNDER SECTION 83(b), EVEN IF OPTIONEE REQUESTS THE COMPANY OR ITS REPRESENTATIVE TO MAKE THIS FILING ON OPTIONEE'S BEHALF.

J.    **Entire Agreement; Governing Law.**

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee. This agreement is governed by the internal substantive laws but not the choice of law rules of the State of California.

K.    **No Guarantee of Continued Service.**

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE

TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

*[Remainder of page intentionally left blank.]*

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                    FortiNet, Inc.


_____             _____
 Signature                                   Harold L. Covert


_____             _____
Print Name                                  Chief Financial Officer



_____

_____

Residence Address




A-870

**FORTINET, INC.**

**2000 STOCK PLAN**

**STOCK OPTION AGREEMENT**

Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option Agreement.

I.    **NOTICE OF STOCK OPTION GRANT.**

Name:    ENRICO GARGALE

Address:    VIA MONTE DI PIETA, 1, MILAN 20121

Country:    ITALY

You have been granted an option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Grant Number:  A-870-1

Date of Grant:  APRIL 20, 2005

Vesting Commencement Date: MARCH 1, 2005

Exercise Price per share: $1.95

Total Number of Shares Granted:  7,200

Total Exercise Price: $ 14,040.00

Type of Option:            _____  Incentive Stock Option

                _X__  Nonstatutory Stock Option

Term/Expiration Date:  APRIL 20, 2015

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule:

1/12 of the Shares subject to the Option shall vest on the last day of each full calendar month following the Optionee's vesting commencement date, subject to Optionee's continuing to be a Service Provider on such dates.

Termination Period.

This Option may be exercised, to the extent it is then vested, for three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

## II.    AGREEMENT.

### A.    Grant of Option.

The Plan Administrator of the Company hereby grants to the Optionee named in the Notice of Grant (the "Optionee") an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO").

### B.    Exercise of Option.

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

#### 1.    Right to Exercise.

(i)    This Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. For purposes of this Stock Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Company.

(ii)    This Option may not be exercised for a fraction of a Share.

#### 2.    Method of Exercise.

This Option shall be exercisable by delivery of an exercise notice in the form attached as Exhibit A (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares. This

Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with Applicable Laws. Assuming such compliance, for income tax purposes, the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

**C.    Optionee's Representations.**

In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B, and shall read the applicable rules of the Commissioner of Corporations attached to such Investment Representation Statement.

**D.    Lock-Up Period.**

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

**E.    Method of Payment.**

Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)    cash;

(b)    check;

(c)    consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)    surrender of other Shares which: (i) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

(e)    any other method authorized by the Plan, so long as the Company agrees.

F.    **Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

G.    **Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

H.    **Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

I.    **Tax Consequences.**

Set forth below is a brief summary as of the date of this Option of some of the federal tax consequences of exercise of this Option and disposition of the Shares. THIS SUMMARY IS NECESSARILY INCOMPLETE, AND THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. THE OPTIONEE SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THIS OPTION OR DISPOSING OF THE SHARES.

1.    **Exercise of ISO.**

If this Option qualifies as an ISO, there will be no regular federal income tax liability upon the exercise of the Option, although the excess, if any, of the Fair Market Value of the Shares on the date of exercise over the Exercise Price will be treated as an item of adjustment to the alternative minimum taxable income for federal tax purposes and may subject the Optionee to the alternative minimum tax in the year of exercise.

2.    **Exercise of ISO Following Disability or Death.**

If the Optionee ceases to be an Employee as a result of a disability that is not a total and permanent disability as defined in Section 22(e)(3) of the Code, to the extent permitted on the date of termination, the Optionee must exercise an ISO within three months of such termination for the ISO to be qualified as an ISO.

3.    **Exercise of Nonstatutory Stock Option.**

There may be a regular federal income tax liability upon the exercise of a Nonstatutory Stock Option. The Optionee will be treated as having received compensation income (taxable at ordinary income tax rates) equal to the excess, if any, of the Fair Market

Value of the Shares on the date of exercise over the Exercise Price. If Optionee is an Employee or a former Employee, the Company will be required to withhold from Optionee's compensation or collect from Optionee and pay to the applicable taxing authorities an amount in cash equal to a percentage of this compensation income at the time of exercise, and may refuse to honor the exercise and refuse to deliver Shares if such withholding amounts are not delivered at the time of exercise.

### 4.    Disposition of Shares.

In the case of an NSO, if Shares are held for at least one year, any gain realized on disposition of the Shares will be treated as long-term capital gain for federal income tax purposes. In the case of an ISO, if Shares transferred pursuant to the Option are held for at least one year after exercise and at least two years after the Date of Grant, any gain realized on disposition of the Shares will also be treated as long-term capital gain for federal income tax purposes. If Shares purchased under an ISO are disposed of within one year after exercise or two years after the Date of Grant, any gain realized on such disposition will be treated as compensation income (taxable at ordinary income rates) to the extent of the difference between the Exercise Price and the lesser of (i) the Fair Market Value of the Shares on the date of exercise, or (ii) the sale price of the Shares. Any additional gain will be taxed as capital gain, either at short-term or long-term, depending on the period that the ISO Shares were held.

### 5.    Notice of Disqualifying Disposition of ISO Shares.

If the Option granted to Optionee herein is an ISO, and if the Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two years after the Date of Grant, or (ii) the date one year after the date of exercise, the Optionee shall immediately notify the Company in writing of such disposition. Optionee agrees that Optionee may be subject to income tax withholding by the Company on the compensation income recognized by the Optionee.

### J.    Entire Agreement; Governing Law.

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee. This agreement is governed by the internal substantive laws but not the choice of law rules of the State of California.

### K.    No Guarantee of Continued Service.

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND

MPDOCS01/57925.1

AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

*[Remainder of page intentionally left blank.]*

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                    FORTINET, INC.

_____                    _____
Signature                                    Harold L. Covert

_____                    _____
Print Name                                   Chief Financial Officer

_____

_____
Residence Address

A-870-1

**Oggetto:** RE: Gargale, Enrico A-870-1; 4-20-05 grant REISSUED
**Da:** "Dianne D. Robinson" <drobinson@fortinet.com>
**Data:** Thu, 15 Dec 2005 11:36:14 -0800
**A:** "'Enrico Gargale'" <enrico.gargale@nrglex.it>

32

Enrico,


For your records, please find attached a copy of your option agreement
co-signed by Todd Nelson, VP of Legal and General Counsel, on behalf of the
Company.


As always, please contact me should you have any questions.


Thanks,


Dianne Robinson




L.Dianne D. Robinson | Fortinet, Inc.

drobinson@fortinet.com |   <http://www.fortinet.com> www.fortinet.com

------

From: Dianne D. Robinson [mailto:drobinson@fortinet.com]
Sent: Monday, December 05, 2005 10:09 AM
To: 'Enrico Gargale'
Subject: FW: Gargale, Enrico A-870-1; 4-20-05 grant REISSUED


Dear Optionee,

I do not have record of your signed option agreement. Please kindly review
and sign your option agreement, then either hand-deliver, mail, fax
(408-235-7737), or email (scan) the signature page to my attention by
December 31, 2005, since it is pertinent that we have record showing you
accept your grant from the Company.  Also, please notify me of any changes
to your information. I will then arrange for Todd Nelson, VP of Legal and
General Counsel, to sign on behalf of the Company, and then send you a copy.

If in fact you did sign your option agreement and the appointed officer
(i.e. Tricia Chu or Hal Covert) has co-signed on behalf of the Company,
please send me a copy.

If your option has a grant date prior to October 24, 2005 and has the name
of a former Fortinet officer (Tricia Chu or Hal Covert), you can still sign
your agreement. We will change the name to Todd Nelson when he signs.

As always, please don't hesitate to contact me if you have any questions.


Regards,

Dianne Robinson




L.Dianne D. Robinson | Fortinet, Inc.

drobinson@fortinet.com |   <http://www.fortinet.com> www.fortinet.com

------

From: Dianne D. Robinson [mailto:drobinson@fortinet.com]
Sent: Tuesday, August 02, 2005 9:46 AM

Subject: Gargale, Enrico A-870-1; 4-20-05 grant REISSUED

Dear Enrico,

Please find attached the re-issuance of your April 20, 2005 stock option grant. The number of options you received, vesting date, vesting schedule, and option price has NOT been changed. On April 20, 2005 the Board of Directors of Fortinet, Inc. passed a resolution that, stock options with the grant date of April 20, 2005 and thereafter would no longer allow the exercise of unvested shares (or early exercise). In other words, the only change to your April 20, 2005 stock option grant is that shares can only be exercised once they are vested (refer to Section II.B.1.i. of the Stock Option Agreement).

Your revised option grant has a new number, which voids the previous April 20, 2005 grant that I sent you earlier. The new number is your old number followed by a "-1" suffix (i.e. old: A-123, new: A-123-1).

Grants approved from the time Fortinet began thru January 11, 2005 allow for exercise of unvested shares. Grants approved April 20, 2005 and thereafter do NOT allow for early exercise.

Please kindly review and sign your reissued option agreement, then either hand-deliver, send, fax (408-235-7737), or email (scan) the signature page to my attention at your earliest convenience. Also, please notify me of any changes to your information. I will then arrange for Hal Covert, CFO, to sign on behalf of the Company, and send you a copy.

Please contact me if you have any questions. Thank you for your patience.

Regards,

Dianne Robinson

L. Dianne D. Robinson

Corporate / Stock Administration

Fortinet, Inc.
920 Stewart Drive | Sunnyvale, CA 94085
Tel: 408.486.7865 | Fax: 408.235.7737
drobinson@fortinet.com | <http://www.fortinet.com/>
<http://www.fortinet.com> www.fortinet.com

### Disclaimer: This message may contain privileged and/or confidential information. If you have received this e-mail in error or are not the intended recipient, you may not use, copy, disseminate or distribute it; do not open any attachments, delete it immediately from your system and notify the sender promptly by e-mail that you have done so. Thank you. ###

| Gargale, Enrico A-870-1 signed.pdf | Content-Type: application/pdf |
| | Content-Encoding: base64 |

Gargale, Enrico A-1083 signed.pdf

Content-Type:        application/pdf
Content-Encoding: base64

# FORTINET BOARD OF ADVISORS APPOINTMENT AGREEMENT

This Board of Advisors appointment agreement (the "Agreement") is made and entered into as of _1 11_, 2006 (the "Effective Date") between Fortinet, Inc. ("Fortinet") and Avv. Enrico Gargale ("Advisor"), who is appointed hereunder to the Fortinet Board of Advisors (the "BOA").

1.    Appointment; Duties.  In consideration of the compensation and duties described herein, and pursuant to the terms and conditions contained herein, Advisor is hereby appointed to the BOA for the term set forth below (the "Appointment"), to serve on an at-will basis.  Advisor shall provide certain services and expertise as agreed to by the parties from time to time, including (without limitation) the following: technical and market advice, periodic meetings with key Fortinet executives and staff to discuss technical and market issues related to the network security market in general and Fortinet's offerings in particular, introducing Fortinet representatives to potential end-user customers and partners, and ongoing assistance as may be practical in the interest of promoting Fortinet's products and brand.  Advisor shall at all times acting hereunder endeavor to assist in the growth and success of Fortinet, and shall undertake no efforts that are likely to negatively impact Fortinet, its products, goodwill or reputation.  At all times, Advisor will act as an independent contractor (and not as an employee) which means, among other things, that Advisor will not have authority to bind Fortinet and will not be entitled to benefits from Fortinet.  The Appointment shall not take effect unless and until Advisor has executed a Fortinet Confidential Information and Invention Assignment Agreement in the form attached hereto as Exhibit A.

2.    Term.  Advisor shall serve in the aforementioned role for an initial period of one (1) year from the Effective Date (the "Initial Term"), which Initial Term may be extended for subsequent terms by mutual agreement of the parties.

3.    Compensation.  In consideration of the duties and obligations described herein, Advisor shall receive the following:

3.1    Subject to approval by Fortinet's Board of Directors, a nonstatutory stock option for six hundred (600) shares of Fortinet common stock, with an exercise price equal to fair market value of the covered shares on the date of grant and a term of 10 years, 1/12 of which shares shall vest monthly in equal increments subject to Advisor's continuing service to Fortinet.  Said stock option grant shall be subject to the standard terms and according to the standard conditions of grants made to independent contractors under Fortinet's Amended and Restated 2000 Stock Plan or other plans or arrangements as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

3.2    Free use of a FortiGate Antivirus Firewall at Advisor's designated location and as approved by Fortinet.

3.3    Additional objective-based stock options that are based solely on POS reported revenue to Fortinet from Telecom Italia during 2006.  Subject to approval by Fortinet's Board of Directors, Advisor shall receive nonstatutory stock options for shares of Fortinet common stock with an exercise price equal to fair market value of



*Confidential*

the covered shares on the date of grant and a term of 10 years pursuant to the following chart and subject to Advisor's continuing service to Fortinet. Said stock option grant shall be subject to the standard terms and according to the standard conditions of grants made to independent contractors under Fortinet's Amended and Restated 2000 Stock Plan or other plans or arrangements as may be set forth by Fortinet's Board of Directors from time to time, to which terms and conditions Advisor agrees to be bound.

| 2006 POS Reported Revenue From Telecom Italia | Incremental Stock Options to be Granted |
| --- | --- |
| Above US$1 million | 16,666 Shares of Common Stock |
| Above US$2 million | 16,666 Shares of Common Stock |
| Above US$3 million | 16,666 Shares of Common Stock |
| Above US$5 million | 14,285 Shares of Common Stock |
| Above US$7 million | 14,285 Shares of Common Stock |
| Above US$9 million | 14,285 Shares of Common Stock |
| Above US$11 million | 14,285 Shares of Common Stock |
| Above US$13 million | 14,285 Shares of Common Stock |
| Above US$15 million | 14,285 Shares of Common Stock |
| Above US$17million | 14,285 Shares of Common Stock |

4.      Termination of Agreement; Effects. Unless extended, pursuant to Section 2 above, this Agreement shall terminate at the end of the one-year effective term (Initial Term or subsequent one-year terms, as applicable). This Agreement may also be terminated by either party at any time and for any reason upon three (3) days notice to the other party. Termination of this Agreement shall not absolve Advisor of his/her obligation to keep confidential any Fortinet proprietary information to which Advisor may have had access. Upon termination of this Agreement, Advisor shall be entitled to such objective-based stock options, pursuant to Section 3 above, to the extent that sales to Telecom Italia are unambiguously and irrevocably committed prior to the termination of this Agreement, and all such sales are completed pursuant to Section 3 above within 3 months of the date of Termination.

5.      Additional Terms. The parties acknowledge the potential existence of one or more agreements into which they may have entered, including without limitation offer letters, employment agreements, non-disclosure agreements and/or stipulations to arbitrate executed by the parties, and hereby expressly incorporate such agreements herein by reference. To the extent permissible by law all such agreements are to be interpreted consistently with this Agreement; in the event and to the extent any term of this Agreement or this Agreement itself is contradicted or supplemented by a term or terms in another such agreement, the term(s) of the latter shall control. This Agreement shall be governed by the laws of the State of California, as applied to agreements entered into and to be performed entirely within California between California residents, without regard to the principles of conflict of laws. Any controversies or claims arising from or relating to this Agreement, or the breach or validity thereof, which cannot be amicably settled by and between the parties, shall be referred to and finally settled by arbitration. The place of arbitration shall be Santa Clara, California, pursuant to the Streamlined Arbitration Rules and Procedures of Judicial Arbitration and Mediation Services (JAMS), or its successor, before a sole, mutually agreeable arbitrator.



*Confidential*                    -2- C:\Documents and Settings\luca simonelli\Desktop\Board of Advisors Appointment Agreem

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective
Date.

FORTINET, INC.

By: _____

Todd A. Nelson
VP Legal & General Counsel
Its: _____
Fortinet, Inc.

Address:     1090 Kifer Road,
             Sunnyvale, CA 94086-5301
Telephone:   (408) 235-7700
Facsimile:   (408) 235-7737

ADVISOR

By: _____

ENRICO GARGALO
print name

Email: enrico.gargale@mrglex.it
Address:     Via Monte di Pietà, 1
             20121 Milan Italy
Telephone:   +39 (02) 862475
Facsimile:   +39 (02) 867426

*Confidential*

-3- C:\Documents and Settings\luca simonelli\Desktop\Board of Advisors Appointment Agreem

**FORTINET, INC.**
**AT WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,**
**AND ARBITRATION AGREEMENT**

As a condition of my employment with Fortinet, Inc., its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1. *At-Will Employment.*

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR AN UNSPECIFIED DURATION AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS OBTAINED IN WRITING AND SIGNED BY THE PRESIDENT OF THE COMPANY. I ACKNOWLEDGE THAT THIS EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT THE OPTION EITHER OF THE COMPANY OR MYSELF, WITH OR WITHOUT NOTICE.

2. *Confidential Information.*

A. *Company Information.* I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company, except under a non-disclosure agreement duly authorized and executed by the Company. I understand that "Confidential Information" means any non-public information that relates to the actual or anticipated business or research and development of the Company, technical data, trade secrets or know-how, including, but not limited to, research, product plans or other information regarding Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information. I further understand that Confidential Information does not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved or improvements or new versions thereof.

B. *Former Employer Information.* I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

C. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty



\\LINUX\GARGALE\Upschott\Fortinet\ConfidentialInformation.doc (13377)

on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3.    *Returning Company Documents.* I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit A.

4.    *Conflict of Interest Guidelines.* I agree to diligently adhere to the Conflict of Interest Guidelines attached as Exhibit B hereto.

5.    *Representations.* I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

6.    *Arbitration and Equitable Relief.*

A.    *Arbitration.* IN CONSIDERATION OF MY EMPLOYMENT WITH THE COMPANY, ITS PROMISE TO ARBITRATE ALL EMPLOYMENT-RELATED DISPUTES AND MY RECEIPT OF THE COMPENSATION, PAY RAISES AND OTHER BENEFITS PAID TO ME BY THE COMPANY, AT PRESENT AND IN THE FUTURE, I AGREE THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING THE COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE) ARISING OUT OF, RELATING TO, OR RESULTING FROM MY EMPLOYMENT WITH THE COMPANY OR THE TERMINATION OF MY EMPLOYMENT WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE ARBITRATION RULES SET FORTH IN CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1280 THROUGH 1294.2, INCLUDING SECTION 1283.05 (THE "RULES") AND PURSUANT TO CALIFORNIA LAW. DISPUTES WHICH I AGREE TO ARBITRATE, AND THEREBY AGREE TO WAIVE ANY RIGHT TO A TRIAL BY JURY, INCLUDE ANY STATUTORY CLAIMS UNDER STATE OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA



FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS OF HARASSMENT, DISCRIMINATION OR WRONGFUL TERMINATION AND ANY STATUTORY CLAIMS. I FURTHER UNDERSTAND THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE WITH ME.

   B.     *Procedure.* I AGREE THAT ANY ARBITRATION WILL BE ADMINISTERED BY THE AMERICAN ARBITRATION ASSOCIATION ("AAA") AND THAT THE NEUTRAL ARBITRATOR WILL BE SELECTED IN A MANNER CONSISTENT WITH ITS NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES. I AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS, PRIOR TO ANY ARBITRATION HEARING. I ALSO AGREE THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES, INCLUDING ATTORNEYS' FEES AND COSTS, AVAILABLE UNDER APPLICABLE LAW. I UNDERSTAND THAT THE COMPANY WILL PAY FOR ANY ADMINISTRATIVE OR HEARING FEES CHARGED BY THE ARBITRATOR OR AAA EXCEPT THAT I SHALL PAY THE FIRST $125.00 OF ANY FILING FEES ASSOCIATED WITH ANY ARBITRATION I INITIATE. I AGREE THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN A MANNER CONSISTENT WITH THE RULES AND THAT TO THE EXTENT THAT THE AAA'S NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES CONFLICT WITH THE RULES, THE RULES SHALL TAKE PRECEDENCE. I AGREE THAT THE DECISION OF THE ARBITRATOR SHALL BE IN WRITING.

   C.     *Remedy.* EXCEPT AS PROVIDED BY THE RULES AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE AND FINAL REMEDY FOR ANY DISPUTE BETWEEN ME AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE RULES AND THIS AGREEMENT, NEITHER I NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION. NOTWITHSTANDING, THE ARBITRATOR WILL NOT HAVE THE AUTHORITY TO DISREGARD OR REFUSE TO ENFORCE ANY LAWFUL COMPANY POLICY, AND THE ARBITRATOR SHALL NOT ORDER OR REQUIRE THE COMPANY TO ADOPT A POLICY NOT OTHERWISE REQUIRED BY LAW WHICH THE COMPANY HAS NOT ADOPTED.

   D.     *Availability of Injunctive Relief.* BOTH PARTIES AGREE THAT ANY PARTY MAY PETITION A COURT FOR INJUNCTIVE RELIEF AS PERMITTED BY THE RULES INCLUDING, BUT NOT LIMITED TO, WHERE EITHER PARTY ALLEGES OR CLAIMS A VIOLATION OF THE AT-WILL EMPLOYMENT, CONFIDENTIAL information AND ARBITRATION AGREEMENT BETWEEN ME AND THE COMPANY OR ANY OTHER AGREEMENT REGARDING TRADE SECRETS, CONFIDENTIAL INFORMATION, NONSOLICITATION OR LABOR CODE §2870. BOTH PARTIES UNDERSTAND THAT ANY BREACH OR THREATENED BREACH OF SUCH AN AGREEMENT WILL CAUSE

IRREPARABLE INJURY AND THAT MONEY DAMAGES WILL NOT PROVIDE AN ADEQUATE REMEDY THEREFOR AND BOTH PARTIES HEREBY CONSENT TO THE ISSUANCE OF AN INJUNCTION. IN THE EVENT EITHER PARTY SEEKS INJUNCTIVE RELIEF, THE PREVAILING PARTY SHALL BE ENTITLED TO RECOVER REASONABLE COSTS AND ATTORNEYS' FEES.

       E.    *Administrative Relief.* I UNDERSTAND THAT THIS AGREEMENT DOES NOT PROHIBIT ME FROM PURSUING AN ADMINISTRATIVE CLAIM WITH A LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODY SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE ME FROM PURSUING COURT ACTION REGARDING ANY SUCH CLAIM.

       F.    *Voluntary Nature of Agreement.* I ACKNOWLEDGE AND AGREE THAT I AM EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. I FURTHER ACKNOWLEDGE AND AGREE THAT I HAVE CAREFULLY READ THIS AGREEMENT AND THAT I HAVE ASKED ANY QUESTIONS NEEDED FOR ME TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT *I AM WAIVING MY RIGHT TO A JURY TRIAL.* FINALLY, I AGREE THAT I HAVE BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF MY CHOICE BEFORE SIGNING THIS AGREEMENT.

   7.    *General Provisions.*

       A.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

       B.    *Entire Agreement.* This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and supersedes all prior discussions or representations between us including, but not limited to, any representations made during my interview(s) or relocation negotiations, whether written or oral. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the President of the Company and me. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.



       C.    *Severability.* If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

D.    *Successors and Assigns.* This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

Date: 01 / 01 / 2006

Signature

ENRICO GARGALE

Name of Employee (typed or printed)

Witness:

_____
Signature

_____
Name (typed or printed)

\\LINUX\GARGALE\Upschott\Fortinet\ConfidentialInformation.doc (13577)    –5–

**Exhibit A**

FORTINET, INC.

**TERMINATION CERTIFICATION**

This is to certify that I do not have in my possession, nor have I failed to return, any devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items belonging to Fortinet, Inc., its subsidiaries, affiliates, successors or assigns (together, the "Company").

I further certify that I have complied with all the terms of the Company's At Will Employment, Confidential Information and Arbitration Agreement signed by me.

I further agree that, in compliance with the At Will Employment, Confidential Information, and Arbitration Agreement, I will preserve as confidential all trade secrets, confidential knowledge, data or other proprietary information relating to products, processes, know-how, designs, formulas, developmental or experimental work, computer programs, data bases, other original works of authorship, customer lists, business plans, financial information or other subject matter pertaining to any business of the Company or any of its employees, clients, consultants or licensees.

I further agree that for twelve (12) months from this date, I will not solicit, induce, recruit or encourage any of the Company's employees to leave their employment.

Date: 09/01/2006

_____
(Employee's Signature)

ENRICO GARGALE
_____
(Type/Print Employee's Name)

\\LINUX\GARGALE\Upschott\Fortinet\Confidential Information.doc (13377)

Exhibit B

FORTINET, INC.

CONFLICT OF INTEREST GUIDELINES

It is the policy of Fortinet, Inc. to conduct its affairs in strict compliance with the letter and spirit of the law and to adhere to the highest principles of business ethics. Accordingly, all officers, employees and independent contractors must avoid activities which are in conflict, or give the appearance of being in conflict, with these principles and with the interests of the Company. The following are potentially compromising situations which must be avoided. Any exceptions must be reported to the President and written approval for continuation must be obtained.

1.    Revealing confidential information to outsiders or misusing confidential information. Unauthorized divulging of information is a violation of this policy whether or not for personal gain and whether or not harm to the Company is intended. (The At Will Employment, Confidential Information, and Arbitration Agreement elaborates on this principle and is a binding agreement.)

2.    Accepting or offering substantial gifts, excessive entertainment, favors or payments which may be deemed to constitute undue influence or otherwise be improper or embarrassing to the Company.

3.    Participating in civic or professional organizations that might involve divulging confidential information of the Company.

4.    Initiating or approving personnel actions affecting reward or punishment of employees or applicants where there is a family relationship or is or appears to be a personal or social involvement.

5.    Initiating or approving any form of personal or social harassment of employees.

6.    Investing or holding outside directorship in suppliers, customers, or competing companies, including financial speculations, where such investment or directorship might influence in any manner a decision or course of action of the Company.

7.    Borrowing from or lending to employees, customers or suppliers.

8.    Acquiring real estate of interest to the Company.

9.    Improperly using or disclosing to the Company any proprietary information or trade secrets of any former or concurrent employer or other person or entity with whom obligations of confidentiality exist.

10.    Unlawfully discussing prices, costs, customers, sales or markets with competing companies or their employees.

\\LINUX\GARGALE\Upschott\Fortinet\ConfidentialInformation.doc (13377)

11.    Making any unlawful agreement with distributors with respect to prices.

12.    Improperly using or authorizing the use of any inventions which are the subject of patent claims of any other person or entity.

13.    Engaging in any conduct which is not in the best interest of the Company.

Each officer, employee and independent contractor must take every necessary action to ensure compliance with these guidelines and to bring problem areas to the attention of higher management for review. Violations of this conflict of interest policy may result in discharge without warning.



FORTINET, INC.

2000 STOCK PLAN

STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the Plan shall have the same defined meanings in this Option Agreement.

**I.**    **NOTICE OF STOCK OPTION GRANT.**

Name:    **Enrico Gargale**

Address:    Via Monte di Pieta 1, Milan,   20121

Country:    Italy

You have been granted an option to purchase Common Stock of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

| | |
|---|---|
| Grant Number: | A-1380 |
| Date of Grant: | January 24, 2006 |
| Vesting Commencement Date: | January 24, 2006 |
| Exercise Price per share: | $1.95 |
| Total Number of Shares Granted: | -33,332- |
| Total Exercise Price: | $64,997.40 |
| Type of Option: | Non-Qualified Stock Option |
| Term/Expiration Date: | January 24, 2016 |

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule: 100 Vested.



Termination Period.

This Option may be exercised, to the extent it is then vested, for three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

## II. AGREEMENT.

### A. Grant of Option.

The Plan Administrator of the Company hereby grants to the Optionee named in the Notice of Grant (the "Optionee") an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

If designated in the Notice of Grant as an Incentive Stock Option ("ISO"), this Option is intended to qualify as an Incentive Stock Option as defined in Section 422 of the Code. Nevertheless, to the extent that it exceeds the $100,000 rule of Code Section 422(d), this Option shall be treated as a Nonstatutory Stock Option ("NSO").

### B. Exercise of Option.

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

#### 1. Right to Exercise.

(i) This Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. For purposes of this Stock Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Company.

(ii) This Option may not be exercised for a fraction of a Share.

#### 2. Method of Exercise.

This Option shall be exercisable by delivery of an exercise notice in the form attached as Exhibit A (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all Exercised Shares. This



Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with Applicable Laws. Assuming such compliance, for income tax purposes, the Shares shall be considered transferred to the Optionee on the date on which the Option is exercised with respect to such Shares.

**C.    Optionee's Representations.**

In the event the Shares have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B, and shall read the applicable rules of the Commissioner of Corporations attached to such Investment Representation Statement.

**D.    Lock-Up Period.**

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

**E.    Method of Payment.**

Payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

       (a)    cash;

       (b)    check;

       (c)    consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

       (d)    surrender of other Shares which: (i) in the case of Shares acquired upon exercise of an option, have been owned by the Optionee for more than six (6) months on the date of surrender, and (ii) have a Fair Market Value on the date of surrender equal to the aggregate Exercise Price of the Exercised Shares.

       (e)    any other method authorized by the Plan, so long as the Company agrees.



F.    **Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any Applicable Law.

G.    **Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

H.    **Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

I.    **Tax Consequences.**

Set forth below is a brief summary as of the date of this Option of some of the federal tax consequences of exercise of this Option and disposition of the Shares. THIS SUMMARY IS NECESSARILY INCOMPLETE, AND THE TAX LAWS AND REGULATIONS ARE SUBJECT TO CHANGE. THE OPTIONEE SHOULD CONSULT A TAX ADVISER BEFORE EXERCISING THIS OPTION OR DISPOSING OF THE SHARES.

1.    **Exercise of ISO.**

If this Option qualifies as an ISO, there will be no regular federal income tax liability upon the exercise of the Option, although the excess, if any, of the Fair Market Value of the Shares on the date of exercise over the Exercise Price will be treated as an item of adjustment to the alternative minimum taxable income for federal tax purposes and may subject the Optionee to the alternative minimum tax in the year of exercise.

2.    **Exercise of ISO Following Disability or Death.**

If the Optionee ceases to be an Employee as a result of a disability that is not a total and permanent disability as defined in Section 22(e)(3) of the Code, to the extent permitted on the date of termination, the Optionee must exercise an ISO within three months of such termination for the ISO to be qualified as an ISO.

3.    **Exercise of Nonstatutory Stock Option.**

There may be a regular federal income tax liability upon the exercise of a Nonstatutory Stock Option. The Optionee will be treated as having received compensation income (taxable at ordinary income tax rates) equal to the excess, if any, of the Fair Market



Value of the Shares on the date of exercise over the Exercise Price. If Optionee is an Employee or a former Employee, the Company will be required to withhold from Optionee's compensation or collect from Optionee and pay to the applicable taxing authorities an amount in cash equal to a percentage of this compensation income at the time of exercise, and may refuse to honor the exercise and refuse to deliver Shares if such withholding amounts are not delivered at the time of exercise.

### 4.     Disposition of Shares.

In the case of an NSO, if Shares are held for at least one year, any gain realized on disposition of the Shares will be treated as long-term capital gain for federal income tax purposes. In the case of an ISO, if Shares transferred pursuant to the Option are held for at least one year after exercise and at least two years after the Date of Grant, any gain realized on disposition of the Shares will also be treated as long-term capital gain for federal income tax purposes. If Shares purchased under an ISO are disposed of within one year after exercise or two years after the Date of Grant, any gain realized on such disposition will be treated as compensation income (taxable at ordinary income rates) to the extent of the difference between the Exercise Price and the lesser of (i) the Fair Market Value of the Shares on the date of exercise, or (ii) the sale price of the Shares. Any additional gain will be taxed as capital gain, either at short-term or long-term, depending on the period that the ISO Shares were held.

### 5.     Notice of Disqualifying Disposition of ISO Shares.

If the Option granted to Optionee herein is an ISO, and if the Optionee sells or otherwise disposes of any of the Shares acquired pursuant to the ISO on or before the later of (i) the date two years after the Date of Grant, or (ii) the date one year after the date of exercise, the Optionee shall immediately notify the Company in writing of such disposition. Optionee agrees that Optionee may be subject to income tax withholding by the Company on the compensation income recognized by the Optionee.

### J.     Entire Agreement; Governing Law.

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee. This agreement is governed by the internal substantive laws but not the choice of law rules of the State of California.

### K.     No Guarantee of Continued Service.

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF SHARES PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE COMPANY (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND



AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE COMPANY'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE.

*[Remainder of page intentionally left blank.]*

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of the Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                    FORTINET, INC.

_____                    _____
Signature                                    Todd Nelson

Enrico Gargale                               _____
                                             Vice President, Legal and General Counsel

VIA MONTE DI PIETA' 1
IT- 10121 MILAN ITALY
Residence Address

FORTINET, INC.

2000 STOCK PLAN

INTERNATIONAL STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the 2000 Stock Plan (the "Plan") shall have the same defined meanings in this International Stock Option Agreement ("Option Agreement").

I.     **NOTICE OF STOCK OPTION GRANT.**

Name:     Enrico Gargale

Address:

Via Monte Di Pieta, 1
Milan,  20121

Country:  Italy

You have been granted an Option to purchase Shares of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Grant Number:  A-1542

Date of Grant: 7/20/2006

Vesting Commencement Date: 7/20/2006

Exercise Price per share: $2.15

Total Number of Shares Granted:   16,666

Total Exercise Price:  $ 35,831.90

Type of Option:  U.S. Nonstatutory Option

Term/Expiration Date:  7/20/2016

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule:

MPDOCS01/57925.1
SFODMS/6494010.3



All shares subject to this Option Agreement shall vest immediately upon the Vesting Commencement Date.

Pursuant to the terms of the Plan, vesting of the Option shall be tolled during any unpaid leave of absence of the Optionee. However, this will not be applied if contrary to local law.

Termination Period.

This Option may be exercised, to the extent it is then vested, for up to three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for up to one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

**II.    AGREEMENT.**

**A.    Grant of Option.**

The Administrator of the Company hereby grants to the optionee (the "Optionee") named in the Notice of Grant incorporated as Part I of this Option Agreement, an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

**B.    Exercise of Option.**

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

**1.    Right to Exercise.**

(i)    This Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. For purposes of this Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Optionee's employer (the "Employer").

(ii)    This Option may not be exercised for a fraction of a Share.

**2.    Method of Exercise.**

This Option shall be exercisable by delivery of an exercise notice in the form attached as Exhibit A (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall



be accompanied by payment of the aggregate Exercise Price as to all exercised Shares. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with applicable laws.

**C.** **Optionee's Representations.**

In the event the Shares have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B, and shall read the applicable rules of the U.S. Commissioner of Corporations attached to such Investment Representation Statement.

**D.** **Lock-Up Period.**

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

**E.** **Method of Payment.**

**1.** **Method of Payment for Optionees Not Resident in China.**

For Optionees not resident in China, payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)     cash;

(b)     check;

(c)     consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)     any other method authorized by the Plan, so long as the Company agrees.



2.    **Method of Payment for Optionees Resident in China.**

Due to legal restrictions in China, Optionees resident in China must use the cashless sell-all method of exercise, whereby all the Shares the Optionee is entitled to at exercise are immediately sold and the proceeds less the Exercise Price, applicable taxes and brokers' fees, if any, are remitted to Optionee in cash. Pursuant to a cashless sell-all exercise, Optionee must deliver, together with such other documentation as the Company in its sole and absolute discretion shall require, irrevocable instructions to an approved broker to (i) sell the Shares issuable upon exercise of the Option; and (ii) deliver to the Company the amount of sale proceeds required to pay the Exercise Price and any withholding taxes and brokers' fees. Because this exercise method requires Shares to be sold, exercises will not be permitted until the Company's Shares become publicly traded on a regulated U.S. stock exchange.

F.    **Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any applicable law.

G.    **Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

H.    **Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

I.    **Entire Agreement.**

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

J.    **No Guarantee of Continued Service.**

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF THIS OPTION PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE EMPLOYER (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR



ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE EMPLOYER'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE IN ACCORDANCE WITH APPLICABLE LAWS.

**K.**    **Responsibility for Taxes.**

Regardless of any action the Company or the Employer takes with respect to any or all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), Optionee hereby acknowledges that the ultimate liability for all Tax-Related Items legally due by the Optionee is and remains the Optionee's responsibility and that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of this Option grant, including the grant, vesting or exercise of this Option, the subsequent sale of Shares acquired pursuant to such exercise and the receipt of any dividends; and (2) do not commit to structure the terms of the grant or any aspect of this Option to reduce or eliminate the Optionee's liability for Tax-Related Items.

Prior to exercise of this Option, the Optionee shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding and payment on account obligations of the Company and/or the Employer. In this regard, Optionee hereby authorizes the Company and/or the Employer to withhold all applicable Tax-Related Items legally payable by the Optionee from the Optionee's wages or other cash compensation paid to the Optionee by the Company and/or the Employer or from proceeds of the sale of Shares. Alternatively, or in addition, if permissible under local law, the Company may (1) sell or arrange for the sale of Shares that the Optionee acquires to meet the withholding obligation for Tax-Related Items, and/or (2) withhold in Shares, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum withholding amount. Finally, the Optionee shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of the Optionee's participation in the Plan or the Optionee's purchase of Shares that cannot be satisfied by the means previously described. The Company may refuse to honor the exercise and refuse to deliver the Shares if the Optionee fails to comply with the Optionee's obligations in connection with the Tax-Related Items as described in this Section K.

**L.**    **Nature of Grant.**

In accepting the Option grant, Optionee acknowledges that:

1.    the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the

MPDOCS01/57925.1

SFODMS/8494010.3



Company at any time, unless otherwise provided in the Plan and this Option Agreement;

2. the grant of this Option is voluntary and occasional and does not create any contractual or other right to receive future grants of options, or benefits in lieu of options, even if options have been granted repeatedly in the past;

3. all decisions with respect to future option grants, if any, will be at the sole discretion of the Company;

4. the Optionee's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate the Optionee's employment relationship at any time with or without cause in accordance with applicable laws;

5. the Optionee is voluntarily participating in the Plan;

6. this Option is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company or the Employer, and which is outside the scope of the Optionee's employment contract, if any;

7. this Option is not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments and in no event should be considered as compensation for, or relating in any way to, past services for the Company or the Employer;

8. in the event that the Optionee is not an employee of Company, this Option grant will not be interpreted to form an employment contract or relationship with the Company; and furthermore, this Option grant will not be interpreted to form an employment contract with the Employer or any subsidiary or affiliate of the Company;

9. the future value of the Shares is unknown and cannot be predicted with certainty;

10. if the Shares do not increase in value, this Option will have no value;

11. if the Optionee exercises this Option and obtains the Shares, the value of the Shares acquired upon exercise may increase or decrease in value, even below the exercise price;

12. in consideration of the grant of this Option, no claim or entitlement to compensation or damages shall arise from termination of this Option or



diminution in value of this Option or the Shares purchased through exercise of this Option resulting from termination of the Optionee's employment by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) and the Optionee irrevocably releases the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing this Option Agreement, the Optionee shall be deemed irrevocably to have waived his or her entitlement to pursue such claim; and

13.   In the event of termination of the Optionee's employment (whether or not in breach of local labor laws), the Optionee's right to receive this Option and vest in this Option under the Plan, if any, will terminate effective as of the date that the Optionee is no longer actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); furthermore, in the event of termination of employment (whether or not in breach of local labor laws), the Optionee's right to exercise this Option after termination of employment, if any, will be measured by the date of termination of the Optionee's active employment and will not be extended by any notice period mandated under local law; the Administrator shall have the exclusive discretion to determine when the Optionee is no longer actively employed for purposes of this Option grant.

M.   *Data Privacy.*

*Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Optionee's personal data as described in this document by and among, as applicable, the Employer, and the Company and its subsidiaries and affiliates for the exclusive purpose of implementing, administering and managing the Optionee's participation in the Plan.*

*Optionee understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, the Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Optionee's favor, for the purpose of implementing, administering and managing the Plan ("Data"). Optionee understands that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the Optionee's country or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Optionee's country. Optionee understand that he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Optionee authorizes the*



*recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing his or her participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee may elect to deposit any shares of stock acquired upon exercise of this Option. Optionee understands that Data will be held only as long as is necessary to implement, administer and manage his or her participation in the Plan. Optionee understands that he or she may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Optionee understands, however, that refusing or withdrawing his or her consent may affect his or her ability to participate in the Plan. For more information on the consequences of the Optionee's refusal to consent or withdrawal of consent, Optionee understands that he or she may contact the local human resources representative.*

**N.     Governing Law; Venue for Litigation.**

This Option grant and the provisions of this Option Agreement are governed by, and subject to, the internal substantive laws but not the choice of law rules of the State of California.

For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or the Option Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of the State of California and agree that such litigation shall be conducted only in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this grant is made and/or to be performed.

**O.     Language.**

If the Optionee has received this Option Agreement or any other document related to the Plan translated into a language other than English and if the translated version is different than the English version, the English version will control.

**P.     Consent to Receive Information in English for Quebec Employees.**

The parties acknowledge that it is their express wish that the present agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, reliés directement ou indirectement à la présente convention.



Q.     **Electronic Delivery.**

The Company may, in its sole discretion, decide to deliver any documents related to this Option granted under and participation in the Plan or future options that may be granted under the Plan by electronic means or to request the Optionee's consent to participate in the Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

R.     **Severability.**

The provisions of this Option Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of this Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                    FORTINET, INC.


Signature                                    Todd Nelson
Enrico Gargale                               Vice President, Legal and General Counsel

Date    7/20/2006

VIA MONTE DI PIETA 1

IT - 10121 MILAN ITALY
Residence Address


A-1542

MPDOCS01/57925.1
SFODMS/6494010.3

Name:  _____

## EXHIBIT A

## FORTINET, INC.
## 2000 STOCK PLAN
## EXERCISE NOTICE

1090 Kifer Road
Sunnyvale, CA 94086
Attention:    Corporate Secretary

1.    Exercise of Option. Effective as of today, _____, 20__, the undersigned ("Optionee") hereby elects to exercise Optionee's option to purchase _____ shares of the Common Stock (the "Shares") of Fortinet, Inc. (the "Company") under and pursuant to the 2000 Stock Plan (the "Plan") and the [____]Incentive [____]Nonstatutory Stock Option Agreement dated _____, 20____ (the "Option Agreement").

2.    Delivery of Payment. Purchaser herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement.

3.    Representation of Optionee. Optionee acknowledges that Optionee has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their terms and conditions.

4.    Rights as Stockholder. Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. The Shares shall be issued to the Optionee as soon as practicable after the Option is exercised. No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 12 of the Plan.

5.    Company's Right of First Refusal. Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the "Right of First Refusal").

(a)    Notice of Proposed Transfer. The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed

purchaser or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "Offered Price"); and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)  Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)  Purchase Price.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)  Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)  Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)  Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.

(g)      Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, (ii) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, but excluding any merger effected primarily for the purpose of changing the domicile of the Company) in which the stockholders of the Company immediately prior to the transaction (or first step in such related transactions) do not retain at least fifty percent (50%) or more of the outstanding voting power of the Company; or (iii) a sale of all or substantially all of the assets of the Company.

6.      Tax Consultation.  Optionee understands that Optionee may suffer adverse tax consequences as a result of Optionee's purchase or disposition of the Shares. Optionee represents that Optionee has consulted with any tax consultants Optionee deems advisable in connection with the purchase or disposition of the Shares and that Optionee is not relying on the Company for any tax advice.

7.      Restrictive Legends and Stop-Transfer Orders.

(a)      Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COMPANY COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL OPTIONS HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.



THE SHARES REPRESENTED BY THIS CERTIFICATE ARE
SUBJECT TO A LOCK-UP PERIOD OF UP TO 180 DAYS
FOLLOWING THE EFFECTIVE DATE OF A REGISTRATION
STATEMENT OF THE COMPANY FILED UNDER THE
SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH
IN AN AGREEMENT BETWEEN THE COMPANY AND THE
ORIGINAL HOLDER OF THESE SHARES, A COPY OF
WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE
OF THE COMPANY. SUCH LOCK-UP PERIOD IS BINDING
ON TRANSFEREES OF THESE SHARES.

IT IS UNLAWFUL TO CONSUMMATE A SALE OR
TRANSFER OF THIS SECURITY, OR ANY INTEREST
THEREIN, OR TO RECEIVE ANY CONSIDERATION
THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF
THE COMMISSIONER OF CORPORATIONS OF THE STATE
OF CALIFORNIA, EXCEPT AS PERMITTED IN THE
COMMISSIONER'S RULES.

Optionee understands that transfer of the Shares may be restricted by
Section 260.141.11 of Title 10 of the California Code of Regulations, a copy of which is
attached to Exhibit B, the Investment Representation Statement.

(b)     Optionee agrees that, in order to ensure compliance with the
restrictions referred to herein, the Company may issue appropriate "stop transfer"
instructions to its transfer agent, if any, and that, if the Company transfers its own
securities, it may make appropriate notations to the same effect in its own records.

(c)     Refusal to Transfer. The Company shall not be required (i) to
transfer on its books any Shares that have been sold or otherwise transferred in violation
of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to
accord the right to vote or pay dividends to any purchaser or other transferee to whom
such Shares shall have been so transferred.

8.     Successors and Assigns. The Company may assign any of its rights under
this Agreement to single or multiple assignees, and this Agreement shall insure to the
benefit of the successors and assigns of the Company. Subject to the restrictions on
transfer herein set forth, this Agreement shall be binding upon Optionee and his or her
heirs, executors, administrators, successors and assigns.

9     Interpretation. Any dispute regarding the interpretation of this Agreement
shall be submitted by Optionee or by the Company forthwith to the Administrator which
shall review such dispute at its next regular meeting. The resolution of such a dispute by
the Administrator shall be final and binding on all parties.

10.     Governing Law; Severability. This Agreement is governed by the internal
substantive laws, but not the choice of law rules, of the State of California.

11.    <u>Entire Agreement</u>. The Plan and Option Agreement are incorporated herein by reference. This Agreement, the Plan, the Restricted Stock Purchase Agreement, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

Submitted by:                           Accepted by:

OPTIONEE:                               FORTINET, INC.

_____              _____
Signature                               Todd Nelson


_____              _____
Print Name                              Vice President, Legal and General Counsel

Address:

_____

_____

US Tax ID Number:

_____


                                        Date Received: _____, 20_____



**EXHIBIT B**

INVESTMENT REPRESENTATION STATEMENT

| | |
|---|---|
| OPTIONEE: | Enrico Gargale |
| COMPANY: | Fortinet, Inc. |
| SECURITY: | Common Stock |
| GRANT NUMBER: | A-1542 |
| DATE: | 7/20/2006 |

In connection with the purchase of the above-listed Securities, the undersigned Optionee represents to the Company the following:

(a) Optionee is aware of the Company's business affairs and financial conditions and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Optionee is acquiring these Securities for investment for Optionee's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act")

(b) Optionee acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Optionee's investment intent as expressed herein. In this connection, Optionee understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Optionee's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one year or any other fixed period in the future. Optionee further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Optionee further acknowledges and understands that the Company is under no obligation to register the Securities. Optionee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company, a legend prohibiting their transfer without the consent of the Commissioner of Corporations of the State of California and any other legend required under applicable state securities laws.

(c) Optionee is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public

192450v1

offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Optionee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which require the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

(d)     Optionee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with the Regulation A, or some other registration exemption will not be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Optionee understands that no assurances can be given that any such other registration exemption will be available in such event.

(e)     Optionee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities without the consent of the Commissioner of Corporations of California. Optionee has read the applicable Commissioner's Rules with respect to such restriction, a copy of which is attached.

SIGNATURE:

_____

Enrico Gargalo

_____

Date

192450v1



ATTACHMENT 1

STATE OF CALIFORNIA - CALIFORNIA ADMINISTRATIVE CODE
Title 10.  Investment – Chapter 3.  Commissioner of Corporations.

260.141.11: Restriction on Transfer.  (a) The issuer of any security upon which a restriction on transfer has been imposed pursuant to Section 260.141.10 or 260.534 shall cause a copy of this section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b)    It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rules), except:

(1)    to the issuer;
(2)    pursuant to the order or process of any court;
(3)    to any person described in Subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;
(4)    to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;
(5)    to holders of securities of the same class of the same issuer;
(6)    by way of gift or donation inter vivos or on death;
(7)    by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities is not in violation of any securities laws of the foreign state, territory or country concerned;
(8)    to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or member of an underwriting syndicate or selling group;
(9)    if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;
(10)    by way of a sale qualified under Sections 25111, 25112, 25113 or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(11)    by a corporation to a wholly owned subsidiary of such corporation, or by a wholly owned subsidiary of a corporation to such corporation;
(12)    by way of an exchange qualified under Section 25111, 25112 or 25113 of the Code, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(13)    between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;

192450v1

(14) to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state; or

(15) by the State Controller pursuant to the Unclaimed Property Law or by the administrator of the unclaimed property law of another state, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule; (ii) delivers to each purchaser a copy of this rule; and (iii) advises the Commissioner of the name of each purchaser;

(16) by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities;

(17) by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c) The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letters of not less than 10-point size, reading as follows:

"IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."



FORTINET, INC.

2000 STOCK PLAN

INTERNATIONAL STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the 2000 Stock Plan (the "Plan") shall have the same defined meanings in this International Stock Option Agreement ("Option Agreement").

I.    NOTICE OF STOCK OPTION GRANT.

Name:    Enrico Gargale

Address:    Via Monte Di Pieta, 1
Milan,  20121

Country:  Italy

You have been granted an Option to purchase Shares of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Grant Number:  A-1699

Date of Grant:  7/20/2006

Vesting Commencement Date: 7/20/2006

Exercise Price per share: $2.15

Total Number of Shares Granted:   33,332

Total Exercise Price:  $ 71,663.80

Type of Option:  U.S. Nonstatutory Option

Term/Expiration Date:  7/20/2016

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule:

All shares subject to this Option Agreement shall vest immediately upon the Vesting Commencement Date.



Pursuant to the terms of the Plan, vesting of the Option shall be tolled during any unpaid leave of absence of the Optionee. However, this will not be applied if contrary to local law.

Termination Period.

This Option may be exercised, to the extent it is then vested, for up to three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for up to one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

**II.    AGREEMENT.**

**A.    Grant of Option.**

The Administrator of the Company hereby grants to the optionee (the "Optionee") named in the Notice of Grant incorporated as Part I of this Option Agreement, an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

**B.    Exercise of Option.**

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

**1.    Right to Exercise.**

(i)    This Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. For purposes of this Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Optionee's employer (the "Employer").

(ii)    This Option may not be exercised for a fraction of a Share.

**2.    Method of Exercise.**

This Option shall be exercisable by delivery of an exercise notice in the form attached as Exhibit A (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all exercised Shares. This



Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.

No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with applicable laws.

**C.    Optionee's Representations.**

In the event the Shares have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as <u>Exhibit B</u>, and shall read the applicable rules of the U.S. Commissioner of Corporations attached to such Investment Representation Statement.

**D.    Lock-Up Period.**

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

**E.    Method of Payment.**

**1.    Method of Payment for Optionees Not Resident in China.**

For Optionees not resident in China, payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)    cash;

(b)    check;

(c)    consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)    any other method authorized by the Plan, so long as the Company agrees.

**2.    Method of Payment for Optionees Resident in China.**

Due to legal restrictions in China, Optionees resident in China must use the cashless sell-all method of exercise, whereby all the Shares the Optionee is entitled to at exercise



are immediately sold and the proceeds less the Exercise Price, applicable taxes and brokers' fees, if any, are remitted to Optionee in cash. Pursuant to a cashless sell-all exercise, Optionee must deliver, together with such other documentation as the Company in its sole and absolute discretion shall require, irrevocable instructions to an approved broker to (i) sell the Shares issuable upon exercise of the Option; and (ii) deliver to the Company the amount of sale proceeds required to pay the Exercise Price and any withholding taxes and brokers' fees. Because this exercise method requires Shares to be sold, exercises will not be permitted until the Company's Shares become publicly traded on a regulated U.S. stock exchange.

**F.    Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any applicable law.

**G.    Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

**H.    Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

**I.    Entire Agreement.**

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

**J.    No Guarantee of Continued Service.**

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF THIS OPTION PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE EMPLOYER (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT

MPDOC901/57925.1

SFODMS/6494010.3



AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE EMPLOYER'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE IN ACCORDANCE WITH APPLICABLE LAWS.

### K.    Responsibility for Taxes.

Regardless of any action the Company or the Employer takes with respect to any or all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), Optionee hereby acknowledges that the ultimate liability for all Tax-Related Items legally due by the Optionee is and remains the Optionee's responsibility and that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of this Option grant, including the grant, vesting or exercise of this Option, the subsequent sale of Shares acquired pursuant to such exercise and the receipt of any dividends; and (2) do not commit to structure the terms of the grant or any aspect of this Option to reduce or eliminate the Optionee's liability for Tax-Related Items.

Prior to exercise of this Option, the Optionee shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding and payment on account obligations of the Company and/or the Employer. In this regard, Optionee hereby authorizes the Company and/or the Employer to withhold all applicable Tax-Related Items legally payable by the Optionee from the Optionee's wages or other cash compensation paid to the Optionee by the Company and/or the Employer or from proceeds of the sale of Shares. Alternatively, or in addition, if permissible under local law, the Company may (1) sell or arrange for the sale of Shares that the Optionee acquires to meet the withholding obligation for Tax-Related Items, and/or (2) withhold in Shares, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum withholding amount. Finally, the Optionee shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of the Optionee's participation in the Plan or the Optionee's purchase of Shares that cannot be satisfied by the means previously described. The Company may refuse to honor the exercise and refuse to deliver the Shares if the Optionee fails to comply with the Optionee's obligations in connection with the Tax-Related Items as described in this Section K.

### L.    Nature of Grant.

In accepting the Option grant, Optionee acknowledges that:

1.    the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Option Agreement;



2.  the grant of this Option is voluntary and occasional and does not create any contractual or other right to receive future grants of options, or benefits in lieu of options, even if options have been granted repeatedly in the past;

3.  all decisions with respect to future option grants, if any, will be at the sole discretion of the Company;

4.  the Optionee's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate the Optionee's employment relationship at any time with or without cause in accordance with applicable laws;

5.  the Optionee is voluntarily participating in the Plan;

6.  this Option is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company or the Employer, and which is outside the scope of the Optionee's employment contract, if any;

7.  this Option is not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments and in no event should be considered as compensation for, or relating in any way to, past services for the Company or the Employer;

8.  in the event that the Optionee is not an employee of Company, this Option grant will not be interpreted to form an employment contract or relationship with the Company; and furthermore, this Option grant will not be interpreted to form an employment contract with the Employer or any subsidiary or affiliate of the Company;

9.  the future value of the Shares is unknown and cannot be predicted with certainty;

10. if the Shares do not increase in value, this Option will have no value;

11. if the Optionee exercises this Option and obtains the Shares, the value of the Shares acquired upon exercise may increase or decrease in value, even below the exercise price;

12. in consideration of the grant of this Option, no claim or entitlement to compensation or damages shall arise from termination of this Option or diminution in value of this Option or the Shares purchased through exercise of this Option resulting from termination of the Optionee's employment by the Company or the Employer (for any reason whatsoever



and whether or not in breach of local labor laws) and the Optionee irrevocably releases the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing this Option Agreement, the Optionee shall be deemed irrevocably to have waived his or her entitlement to pursue such claim; and

13.    in the event of termination of the Optionee's employment (whether or not in breach of local labor laws), the Optionee's right to receive this Option and vest in this Option under the Plan, if any, will terminate effective as of the date that the Optionee is no longer actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); furthermore, in the event of termination of employment (whether or not in breach of local labor laws), the Optionee's right to exercise this Option after termination of employment, if any, will be measured by the date of termination of the Optionee's active employment and will not be extended by any notice period mandated under local law; the Administrator shall have the exclusive discretion to determine when the Optionee is no longer actively employed for purposes of this Option grant.

M.    *Data Privacy.*

*Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Optionee's personal data as described in this document by and among, as applicable, the Employer, and the Company and its subsidiaries and affiliates for the exclusive purpose of implementing, administering and managing the Optionee's participation in the Plan.*

*Optionee understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, the Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Optionee's favor, for the purpose of implementing, administering and managing the Plan ("Data"). Optionee understands that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the Optionee's country or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Optionee's country. Optionee understand that he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing his or her participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other*



*third party with whom the Optionee may elect to deposit any shares of stock acquired upon exercise of this Option. Optionee understands that Data will be held only as long as is necessary to implement, administer and manage his or her participation in the Plan. Optionee understands that he or she may, at any time, view Data, request additional information about the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Optionee understands, however, that refusing or withdrawing his or her consent may affect his or her ability to participate in the Plan. For more information on the consequences of the Optionee's refusal to consent or withdrawal of consent, Optionee understands that he or she may contact the local human resources representative.*

N.    <u>Governing Law; Venue for Litigation.</u>

This Option grant and the provisions of this Option Agreement are governed by, and subject to, the internal substantive laws but not the choice of law rules of the State of California.

For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or the Option Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of the State of California and agree that such litigation shall be conducted only in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this grant is made and/or to be performed.

O.    <u>Language.</u>

If the Optionee has received this Option Agreement or any other document related to the Plan translated into a language other than English and if the translated version is different than the English version, the English version will control.

P.    <u>Consent to Receive Information in English for Quebec Employees.</u>

The parties acknowledge that it is their express wish that the present agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, reliés directement ou indirectement à la présente convention.



**Q.**  **Electronic Delivery.**

The Company may, in its sole discretion, decide to deliver any documents related to this Option granted under and participation in the Plan or future options that may be granted under the Plan by electronic means or to request the Optionee's consent to participate in the Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**R.**  **Severability.**

The provisions of this Option Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of this Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                         FORTINET, INC.


_Enrico Gargale_                                  _Todd Nelson_
Signature                                         Todd Nelson
Enrico Gargale                                    Vice President, Legal and General Counsel

7 / 20 / 2006
Date

VIA MONTE DI PIETA, 1
IT- 20121 MILAN ITALY
Residence Address


A-1699

<u>Namer</u> _____

## EXHIBIT A

## FORTINET, INC.
### 2000 STOCK PLAN
### EXERCISE NOTICE

1090 Kifer Road
Sunnyvale, CA 94086
Attention:    Corporate Secretary

1.    <u>Exercise of Option</u>. Effective as of today, _____, 20__, the undersigned ("Optionee") hereby elects to exercise Optionee's option to purchase _____ shares of the Common Stock (the "Shares") of Fortinet, Inc. (the "Company") under and pursuant to the 2000 Stock Plan (the "Plan") and the [____]Incentive [____]Nonstatutory Stock Option Agreement dated _____, 20___ (the "Option Agreement").

2.    <u>Delivery of Payment</u>. Purchaser herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement.

3    <u>Representation of Optionee</u>. Optionee acknowledges that Optionee has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their items and conditions.

4.    <u>Rights as Stockholder</u>. Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. The Shares shall be issued to the Optionee as soon as practicable after the Option is exercised. No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 12 of the Plan.

5.    <u>Company's Right of First Refusal</u>. Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the "Right of First Refusal").

(a)    <u>Notice of Proposed Transfer</u>. The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed



purchaser or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "Offered Price"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)     Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)     Purchase Price.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price. If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)     Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)     Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee. If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)     Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section. "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.



(g)    Termination of Right of First Refusal. The Right of First Refusal shall terminate as to any Shares upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, (ii) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, but excluding any merger effected primarily for the purpose of changing the domicile of the Company) in which the stockholders of the Company immediately prior to the transaction (or first step in such related transactions) do not retain at least fifty percent (50%) or more of the outstanding voting power of the Company; or (iii) a sale of all or substantially all of the assets of the Company.

6.    Tax Consultation. Optionee understands that Optionee may suffer adverse tax consequences as a result of Optionee's purchase or disposition of the Shares. Optionee represents that Optionee has consulted with any tax consultants Optionee deems advisable in connection with the purchase or disposition of the Shares and that Optionee is not relying on the Company for any tax advice.

7.    Restrictive Legends and Stop-Transfer Orders.

(a)    Legends. Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

> THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COMPANY COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

> THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL OPTIONS HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER. SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.



THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO A LOCK-UP PERIOD OF UP TO 180 DAYS FOLLOWING THE EFFECTIVE DATE OF A REGISTRATION STATEMENT OF THE COMPANY FILED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AS SET FORTH IN AN AGREEMENT BETWEEN THE COMPANY AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE COMPANY. SUCH LOCK-UP PERIOD IS BINDING ON TRANSFEREES OF THESE SHARES.

IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES.

Optionee understands that transfer of the Shares may be restricted by Section 260.141.11 of Title 10 of the California Code of Regulations, a copy of which is attached to Exhibit B, the Investment Representation Statement.

(b)     Optionee agrees that, in order to ensure compliance with the restrictions referred to herein, the Company may issue appropriate "stop transfer" instructions to its transfer agent, if any, and that, if the Company transfers its own securities, it may make appropriate notations to the same effect in its own records.

(c)     Refusal to Transfer. The Company shall not be required (i) to transfer on its books any Shares that have been sold or otherwise transferred in violation of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to accord the right to vote or pay dividends to any purchaser or other transferee to whom such Shares shall have been so transferred.

8.     Successors and Assigns. The Company may assign any of its rights under this Agreement to single or multiple assignees, and this Agreement shall insure to the benefit of the successors and assigns of the Company. Subject to the restrictions on transfer herein set forth, this Agreement shall be binding upon Optionee and his or her heirs, executors, administrators, successors and assigns.

9     Interpretation. Any dispute regarding the interpretation of this Agreement shall be submitted by Optionee or by the Company forthwith to the Administrator which shall review such dispute at its next regular meeting. The resolution of such a dispute by the Administrator shall be final and binding on all parties.

10.     Governing Law; Severability. This Agreement is governed by the internal substantive laws, but not the choice of law rules, of the State of California.



11.    Entire Agreement. The Plan and Option Agreement are incorporated herein by reference. This Agreement, the Plan, the Restricted Stock Purchase Agreement, the Option Agreement and the Investment Representation Statement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

Submitted by:                          Accepted by:

OPTIONEE:                              FORTINET, INC.

_____            _____
Signature                              Todd Nelson


_____            _____
Print Name                             Vice President, Legal and General Counsel

Address:

_____

_____

_____

US Tax ID Number:

_____

                                       Date Received: _____, 20____



## EXHIBIT B

### INVESTMENT REPRESENTATION STATEMENT

OPTIONEE:        Enrico Gargale

COMPANY:        Fortinet, Inc.

SECURITY:        Common Stock

GRANT NUMBER:   A-1699

DATE:            7/20/2006

In connection with the purchase of the above-listed Securities, the undersigned Optionee represents to the Company the following:

      (a)   Optionee is aware of the Company's business affairs and financial conditions and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities. Optionee is acquiring these Securities for investment for Optionee's own account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act of 1933, as amended (the "Securities Act").

      (b)   Optionee acknowledges and understands that the Securities constitute "restricted securities" under the Securities Act and have not been registered under the Securities Act in reliance upon a specific exemption therefrom, which exemption depends upon, among other things, the bona fide nature of Optionee's investment intent as expressed herein. In this connection, Optionee understands that, in the view of the Securities and Exchange Commission, the statutory basis for such exemption may be unavailable if Optionee's representation was predicated solely upon a present intention to hold these Securities for the minimum capital gains period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the market price of the Securities, or for a period of one year or any other fixed period in the future. Optionee further understands that the Securities must be held indefinitely unless they are subsequently registered under the Securities Act or an exemption from such registration is available. Optionee further acknowledges and understands that the Company is under no obligation to register the Securities. Optionee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities unless they are registered or such registration is not required in the opinion of counsel satisfactory to the Company, a legend prohibiting their transfer without the consent of the Commissioner of Corporations of the State of California and any other legend required under applicable state securities laws.

      (c)   Optionee is familiar with the provisions of Rule 701 and Rule 144, each promulgated under the Securities Act, which, in substance, permit limited public resale of "restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public

offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Optionee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

        In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which require the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

        (d)    Optionee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with the Regulation A, or some other registration exemption will not be required; and that, notwithstanding the fact that Rules 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rules 144 or 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Optionee understands that no assurances can be given that any such other registration exemption will be available in such event.

        (e)    Optionee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities without the consent of the Commissioner of Corporations of California. Optionee has read the applicable Commissioner's Rules with respect to such restriction, a copy of which is attached.

SIGNATURE:

_____

Enrico Gargale

_____

Date

192450v1



ATTACHMENT 1

STATE OF CALIFORNIA - CALIFORNIA ADMINISTRATIVE CODE
Title 10. Investment - Chapter 3. Commissioner of Corporations.


260.141.11: Restriction on Transfer. (a) The issuer of any security upon which a restriction on transfer has been imposed pursuant to Section 260.141.10 or 260.534 shall cause a copy of this section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b)     It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rules), except:

(1)     to the issuer;
(2)     pursuant to the order or process of any court;
(3)     to any person described in Subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;
(4)     to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;
(5)     to holders of securities of the same class of the same issuer;
(6)     by way of gift or donation inter vivos or on death;
(7)     by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities is not in violation of any securities laws of the foreign state, territory or country concerned;
(8)     to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or member of an underwriting syndicate or selling group;
(9)     if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;
(10)     by way of a sale qualified under Sections 25111, 25112, 25113 or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(11)     by a corporation to a wholly owned subsidiary of such corporation, or by a wholly owned subsidiary of a corporation to such corporation;
(12)     by way of an exchange qualified under Section 25111, 25112 or 25113 of the Code, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(13)     between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;

192450v1



(14)    to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state; or

(15)    by the State Controller pursuant to the Unclaimed Property Law or by the administrator of the unclaimed property law of another state, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule; (ii) delivers to each purchaser a copy of this rule; and (iii) advises the Commissioner of the name of each purchaser;

(16)    by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities;

(17)    by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c)    The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letters of not less than 10-point size, reading as follows:

"IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."



FORTINET, INC.

2000 STOCK PLAN

INTERNATIONAL STOCK OPTION AGREEMENT

Unless otherwise defined herein, the terms defined in the 2000 Stock Plan (the "Plan") shall have the same defined meanings in this International Stock Option Agreement ("Option Agreement").

I.    **NOTICE OF STOCK OPTION GRANT.**

Name:    Enrico Gargale

Address:    Via Monte Di Pieta, 1
Milan, 20121

Country:    Italy

You have been granted an Option to purchase Shares of the Company, subject to the terms and conditions of the Plan and this Option Agreement, as follows:

Grant Number:  A-1768

Date of Grant: 10/26/2006

Vesting Commencement Date: 10/26/2006

Exercise Price per share: $2.40

Total Number of Shares Granted:  14,285

Total Exercise Price: $30,712.75

Type of Option:  U.S. Nonstatutory Option

Term/Expiration Date:  10/26/2016

Exercise and Vesting Schedule:

So long as Optionee is a Service Provider, this Option shall be exercisable in whole or in part, and shall vest according to the following vesting schedule:

All shares subject to this Option Agreement shall vest immediately upon the Vesting Commencement Date.



Pursuant to the terms of the Plan, vesting of the Option shall be tolled during any unpaid leave of absence of the Optionee. However, this will not be applied if contrary to local law.

<u>Termination Period</u>.

This Option may be exercised, to the extent it is then vested, for up to three months after Optionee ceases to be a Service Provider. Notwithstanding the foregoing, upon death or Disability of the Optionee, this Option may be exercised, to the extent it is then vested, for up to one year after Optionee ceases to be Service Provider. In no event shall this Option be exercised after the Term/Expiration Date as provided above.

**II.    AGREEMENT.**

**A.    Grant of Option.**

The Administrator of the Company hereby grants to the optionee (the "Optionee") named in the Notice of Grant incorporated as Part I of this Option Agreement, an option (the "Option") to purchase the number of Shares set forth in the Notice of Grant, at the exercise price per Share set forth in the Notice of Grant (the "Exercise Price"), and subject to the terms and conditions of the Plan, which is incorporated herein by reference. Subject to Section 14(c) of the Plan, in the event of a conflict between the terms and conditions of the Plan and this Option Agreement, the terms and conditions of the Plan shall prevail.

**B.    Exercise of Option.**

This Option shall be exercised during its term in accordance with the provisions of Section 9 of the Plan as follows:

**1.    Right to Exercise.**

(i)    This Option shall be exercisable cumulatively according to the vesting schedule set forth in the Notice of Grant. For purposes of this Option Agreement, Shares subject to the Option shall vest based on continued employment of Optionee with the Optionee's employer (the "Employer").

(ii)    This Option may not be exercised for a fraction of a Share.

**2.    Method of Exercise.**

This Option shall be exercisable by delivery of an exercise notice in the form attached as <u>Exhibit A</u> (the "Exercise Notice") which shall state the election to exercise the Option, the number of Shares with respect to which the Option is being exercised, and such other representations and agreements as may be required by the Company. The Exercise Notice shall be accompanied by payment of the aggregate Exercise Price as to all exercised Shares. This Option shall be deemed to be exercised upon receipt by the Company of such fully executed Exercise Notice accompanied by the aggregate Exercise Price.



No Shares shall be issued pursuant to the exercise of an Option unless such issuance and such exercise complies with applicable laws.

C.    Optionee's Representations.

In the event the Shares have not been registered under the U.S. Securities Act of 1933, as amended (the "Securities Act"), at the time this Option is exercised, the Optionee shall, if required by the Company, concurrently with the exercise of all or any portion of this Option, deliver to the Company his or her Investment Representation Statement in the form attached hereto as Exhibit B, and shall read the applicable rules of the U.S. Commissioner of Corporations attached to such Investment Representation Statement.

D.    Lock-Up Period.

Optionee hereby agrees that, if so requested by the Company or any representative of the underwriters (the "Managing Underwriter") in connection with any registration of the offering of any securities of the Company under the Securities Act, Optionee shall not sell or otherwise transfer any Shares or other securities of the Company during the 180-day period (or such other period as may be requested in writing by the Managing Underwriter and agreed to in writing by the Company) (the "Market Standoff Period") following the effective date of a registration statement of the Company filed under the Securities Act. The Company may impose stop-transfer instructions with respect to securities subject to the foregoing restrictions until the end of such Market Standoff Period.

E.    Method of Payment

1.    Method of Payment for Optionees Not Resident in China.

For Optionees not resident in China, payment of the aggregate Exercise Price shall be by any of the following, or a combination thereof, at the election of the Optionee:

(a)    cash;

(b)    check;

(c)    consideration received by the Company under a formal cashless exercise program adopted by the Company in connection with the Plan; or

(d)    any other method authorized by the Plan, so long as the Company agrees.

2.    Method of Payment for Optionees Resident in China.

Due to legal restrictions in China, Optionees resident in China must use the cashless sell-all method of exercise, whereby all the Shares the Optionee is entitled to at exercise are immediately sold and the proceeds less the Exercise Price, applicable taxes and brokers' fees, if any, are remitted to Optionee in cash. Pursuant to a cashless sell-all exercise, Optionee must deliver, together with such other documentation as the Company in its sole and absolute



discretion shall require, irrevocable instructions to an approved broker to (i) sell the Shares issuable upon exercise of the Option; and (ii) deliver to the Company the amount of sale proceeds required to pay the Exercise Price and any withholding taxes and brokers' fees. Because this exercise method requires Shares to be sold, exercises will not be permitted until the Company's Shares become publicly traded on a regulated U.S. stock exchange.

**F.    Restrictions on Exercise.**

This Option may not be exercised until such time as the Plan has been approved by the stockholders of the Company, or if the issuance of such Shares upon such exercise or the method of payment of consideration for such shares would constitute a violation of any applicable law.

**G.    Non-Transferability of Option.**

This Option may not be transferred in any manner otherwise than by will or by the laws of descent or distribution and may be exercised during the lifetime of Optionee only by Optionee. The terms of the Plan and this Option Agreement shall be binding upon the executors, administrators, heirs, successors and assigns of the Optionee.

**H.    Term of Option.**

This Option may be exercised only within the term set out in the Notice of Grant, and may be exercised during such term only in accordance with the Plan and the terms of this Option.

**I.    Entire Agreement.**

The Plan is incorporated herein by reference. The Plan and this Option Agreement constitute the entire agreement of the parties with respect to the subject matter hereof and supersede in their entirety all prior undertakings and agreements of the Company and Optionee with respect to the subject matter hereof, and may not be modified adversely to the Optionee's interest except by means of a writing signed by the Company and Optionee.

**J.    No Guarantee of Continued Service.**

OPTIONEE ACKNOWLEDGES AND AGREES THAT THE VESTING OF THIS OPTION PURSUANT TO THE VESTING SCHEDULE HEREOF IS EARNED ONLY BY CONTINUING AS A SERVICE PROVIDER AT THE WILL OF THE EMPLOYER (NOT THROUGH THE ACT OF BEING HIRED, BEING GRANTED THIS OPTION OR ACQUIRING SHARES HEREUNDER). OPTIONEE FURTHER ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT, THE TRANSACTIONS CONTEMPLATED HEREUNDER AND THE VESTING SCHEDULE SET FORTH HEREIN DO NOT CONSTITUTE AN EXPRESS OR IMPLIED PROMISE OF CONTINUED ENGAGEMENT AS A SERVICE PROVIDER FOR THE VESTING PERIOD, FOR ANY PERIOD, OR AT ALL, AND SHALL NOT INTERFERE IN ANY WAY WITH OPTIONEE'S RIGHT OR THE EMPLOYER'S RIGHT TO TERMINATE OPTIONEE'S RELATIONSHIP AS A SERVICE



PROVIDER AT ANY TIME, WITH OR WITHOUT CAUSE IN ACCORDANCE WITH APPLICABLE LAWS.

K.    Responsibility for Taxes.

Regardless of any action the Company or the Employer takes with respect to any or all income tax, social insurance, payroll tax, payment on account or other tax-related withholding ("Tax-Related Items"), Optionee hereby acknowledges that the ultimate liability for all Tax-Related Items legally due by the Optionee is and remains the Optionee's responsibility and that the Company and/or the Employer (1) make no representations or undertakings regarding the treatment of any Tax-Related Items in connection with any aspect of this Option grant, including the grant, vesting or exercise of this Option, the subsequent sale of Shares acquired pursuant to such exercise and the receipt of any dividends; and (2) do not commit to structure the terms of the grant or any aspect of this Option to reduce or eliminate the Optionee's liability for Tax-Related Items.

Prior to exercise of this Option, the Optionee shall pay or make adequate arrangements satisfactory to the Company and/or the Employer to satisfy all withholding and payment on account obligations of the Company and/or the Employer. In this regard, Optionee hereby authorizes the Company and/or the Employer to withhold all applicable Tax-Related Items legally payable by the Optionee from the Optionee's wages or other cash compensation paid to the Optionee by the Company and/or the Employer or from proceeds of the sale of Shares. Alternatively, or in addition, if permissible under local law, the Company may (1) sell or arrange for the sale of Shares that the Optionee acquires to meet the withholding obligation for Tax-Related Items, and/or (2) withhold in Shares, provided that the Company only withholds the amount of Shares necessary to satisfy the minimum withholding amount. Finally, the Optionee shall pay to the Company or the Employer any amount of Tax-Related Items that the Company or the Employer may be required to withhold as a result of the Optionee's participation in the Plan or the Optionee's purchase of Shares that cannot be satisfied by the means previously described. The Company may refuse to honor the exercise and refuse to deliver the Shares if the Optionee fails to comply with the Optionee's obligations in connection with the Tax-Related Items as described in this Section K.

L.    Nature of Grant.

In accepting the Option grant, Optionee acknowledges that:

1.    the Plan is established voluntarily by the Company, it is discretionary in nature and it may be modified, amended, suspended or terminated by the Company at any time, unless otherwise provided in the Plan and this Option Agreement;

2.    the grant of this Option is voluntary and occasional and does not create any contractual or other right to receive future grants of options, or benefits in lieu of options, even if options have been granted repeatedly in the past;



3.  all decisions with respect to future option grants, if any, will be at the sole discretion of the Company;

4.  the Optionee's participation in the Plan shall not create a right to further employment with the Employer and shall not interfere with the ability of the Employer to terminate the Optionee's employment relationship at any time with or without cause in accordance with applicable laws;

5.  the Optionee is voluntarily participating in the Plan;

6.  this Option is an extraordinary item that does not constitute compensation of any kind for services of any kind rendered to the Company or the Employer, and which is outside the scope of the Optionee's employment contract, if any;

7.  this Option is not part of normal or expected compensation or salary for any purposes, including, but not limited to, calculating any severance, resignation, termination, redundancy, end of service payments, bonuses, long-service awards, pension or retirement benefits or similar payments and in no event should be considered as compensation for, or relating in any way to, past services for the Company or the Employer;

8.  in the event that the Optionee is not an employee of Company, this Option grant will not be interpreted to form an employment contract or relationship with the Company; and furthermore, this Option grant will not be interpreted to form an employment contract with the Employer or any subsidiary or affiliate of the Company;

9.  the future value of the Shares is unknown and cannot be predicted with certainty;

10.  if the Shares do not increase in value, this Option will have no value;

11.  if the Optionee exercises this Option and obtains the Shares, the value of the Shares acquired upon exercise may increase or decrease in value, even below the exercise price;

12.  in consideration of the grant of this Option, no claim or entitlement to compensation or damages shall arise from termination of this Option or diminution in value of this Option or the Shares purchased through exercise of this Option resulting from termination of the Optionee's employment by the Company or the Employer (for any reason whatsoever and whether or not in breach of local labor laws) and the Optionee irrevocably releases the Company and the Employer from any such claim that may arise; if, notwithstanding the foregoing, any such claim is found by a court of competent jurisdiction to have arisen, then, by signing this



Option Agreement, the Optionee shall be deemed irrevocably to have waived his or her entitlement to pursue such claim; and

13.    in the event of termination of the Optionee's employment (whether or not in breach of local labor laws), the Optionee's right to receive this Option and vest in this Option under the Plan, if any, will terminate effective as of the date that the Optionee is no longer actively employed and will not be extended by any notice period mandated under local law (e.g., active employment would not include a period of "garden leave" or similar period pursuant to local law); furthermore, in the event of termination of employment (whether or not in breach of local labor laws), the Optionee's right to exercise this Option after termination of employment, if any, will be measured by the date of termination of the Optionee's active employment and will not be extended by any notice period mandated under local law; the Administrator shall have the exclusive discretion to determine when the Optionee is no longer actively employed for purposes of this Option grant.

M.    *Data Privacy.*

*Optionee hereby explicitly and unambiguously consents to the collection, use and transfer, in electronic or other form, of the Optionee's personal data as described in this document by and among, as applicable, the Employer, and the Company and its subsidiaries and affiliates for the exclusive purpose of implementing, administering and managing the Optionee's participation in the Plan.*

*Optionee understands that the Company and the Employer may hold certain personal information about him or her, including, but not limited to, the Optionee's name, home address and telephone number, date of birth, social insurance number or other identification number, salary, nationality, job title, any shares of stock or directorships held in the Company, details of all options or any other entitlement to shares of stock awarded, canceled, exercised, vested, unvested or outstanding in the Optionee's favor, for the purpose of implementing, administering and managing the Plan ("Data"). Optionee understands that Data may be transferred to any third parties assisting in the implementation, administration and management of the Plan, that these recipients may be located in the Optionee's country or elsewhere, and that the recipients' country (e.g., the United States) may have different data privacy laws and protections than the Optionee's country. Optionee understand that he or she may request a list with the names and addresses of any potential recipients of the Data by contacting his or her local human resources representative. Optionee authorizes the recipients to receive, possess, use, retain and transfer the Data, in electronic or other form, for the sole purpose of implementing, administering and managing his or her participation in the Plan, including any requisite transfer of such Data as may be required to a broker or other third party with whom the Optionee may elect to deposit any shares of stock acquired upon exercise of this Option. Optionee understands that Data will be held only as long as is necessary to implement, administer and manage his or her participation in the Plan. Optionee understands that he or she may, at any time, view Data, request additional information about*



*the storage and processing of Data, require any necessary amendments to Data or refuse or withdraw the consents herein, in any case without cost, by contacting in writing his or her local human resources representative. Optionee understands, however, that refusing or withdrawing his or her consent may affect his or her ability to participate in the Plan. For more information on the consequences of the Optionee's refusal to consent or withdrawal of consent, Optionee understands that he or she may contact the local human resources representative.*

**N.**     <u>Governing Law; Venue for Litigation.</u>

This Option grant and the provisions of this Option Agreement are governed by, and subject to, the internal substantive laws but not the choice of law rules of the State of California.

For purposes of litigating any dispute that arises directly or indirectly from the relationship of the parties evidenced by this grant or the Option Agreement, the parties hereby submit to and consent to the exclusive jurisdiction of the State of California and agree that such litigation shall be conducted only in the courts of San Mateo County, California, or the federal courts for the United States for the Northern District of California, and no other courts, where this grant is made and/or to be performed.

**O.**     <u>Language.</u>

If the Optionee has received this Option Agreement or any other document related to the Plan translated into a language other than English and if the translated version is different than the English version, the English version will control.

**P.**     <u>Consent to Receive Information in English for Quebec Employees.</u>

The parties acknowledge that it is their express wish that the present agreement, as well as all documents, notices and legal proceedings entered into, given or instituted pursuant hereto or relating directly or indirectly hereto, be drawn up in English.

Les parties reconnaissent avoir exigé la rédaction en anglais de la présente convention, ainsi que de tous documents exécutés, avis donnés et procédures judiciaires intentées, reliés directement ou indirectement à la présente convention.

**Q.**     <u>Electronic Delivery.</u>

The Company may, in its sole discretion, decide to deliver any documents related to this Option granted under and participation in the Plan or future options that may be granted under the Plan by electronic means or to request the Optionee's consent to participate in the Plan by electronic means. Optionee hereby consents to receive such documents by electronic delivery and, if requested, to agree to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.



R.    <u>Severability</u>.

The provisions of this Option Agreement are severable and if any one or more provisions are determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions shall nevertheless be binding and enforceable.

Optionee acknowledges receipt of a copy of the Plan and represents that he or she is familiar with the terms and provisions thereof, and hereby accepts this Option subject to all of the terms and provisions thereof. Optionee has reviewed the Plan and this Option in their entirety, has had an opportunity to obtain the advice of counsel prior to executing this Option and fully understands all provisions of this Option. Optionee hereby agrees to accept as binding, conclusive and final all decisions or interpretations of the Administrator upon any questions arising under the Plan or this Option. Optionee further agrees to notify the Company upon any change in the residence address indicated below.

OPTIONEE:                                FORTINET, INC.


Signature                                Todd Nelson


Enrico Gargale                           Vice President, Legal and General Counsel

VIA MONTE DI PIETA, 1
IT-20121 MILAN ITALY
Residence Address

A-1768

Name: _____

### EXHIBIT A

### FORTINET, INC.
### 2000 STOCK PLAN
### EXERCISE NOTICE

1090 Kifer Road
Sunnyvale, CA 94086
Attention:    Corporate Secretary

1.    Exercise of Option. Effective as of today, _____, 20__, the undersigned ("Optionee") hereby elects to exercise Optionee's option to purchase _____ shares of the Common Stock (the "Shares") of Fortinet, Inc. (the "Company") under and pursuant to the 2000 Stock Plan (the "Plan") and the [___] Incentive [___] Nonstatutory Stock Option Agreement dated _____, 20__ (the "Option Agreement").

2.    Delivery of Payment. Purchaser herewith delivers to the Company the full purchase price of the Shares, as set forth in the Option Agreement.

3    Representation of Optionee. Optionee acknowledges that Optionee has received, read and understood the Plan and the Option Agreement and agrees to abide by and be bound by their items and conditions.

4.    Rights as Stockholder. Until the issuance of the Shares (as evidenced by the appropriate entry on the books of the Company or of a duly authorized transfer agent of the Company), no right to vote or receive dividends or any other rights as a stockholder shall exist with respect to the Optioned Stock, notwithstanding the exercise of the Option. The Shares shall be issued to the Optionee as soon as practicable after the Option is exercised. No adjustment shall be made for a dividend or other right for which the record date is prior to the date of issuance except as provided in Section 12 of the Plan.

5.    Company's Right of First Refusal. Before any Shares held by Optionee or any transferee (either being sometimes referred to herein as the "Holder") may be sold or otherwise transferred (including transfer by gift or operation of law), the Company or its assignee(s) shall have a right of first refusal to purchase the Shares on the terms and conditions set forth in this Section (the "Right of First Refusal").

(a)    Notice of Proposed Transfer. The Holder of the Shares shall deliver to the Company a written notice (the "Notice") stating: (i) the Holder's bona fide intention to sell or otherwise transfer such Shares; (ii) the name of each proposed



purchaser or other transferee ("Proposed Transferee"); (iii) the number of Shares to be transferred to each Proposed Transferee; and (iv) the bona fide cash price or other consideration for which the Holder proposes to transfer the Shares (the "Offered Price"), and the Holder shall offer the Shares at the Offered Price to the Company or its assignee(s).

(b)    Exercise of Right of First Refusal.  At any time within thirty (30) days after receipt of the Notice, the Company and/or its assignee(s) may, by giving notice to the Holder, elect to purchase all, but not less than all, of the Shares proposed to be transferred to any one or more of the Proposed Transferees, at the purchase price determined in accordance with subsection (c) below.

(c)    Purchase Price.  The purchase price ("Purchase Price") for the Shares purchased by the Company or its assignee(s) under this Section shall be the Offered Price.  If the Offered Price includes consideration other than cash, the cash equivalent value of the non-cash consideration shall be determined by the Board of Directors of the Company in good faith.

(d)    Payment.  Payment of the Purchase Price shall be made, at the option of the Company or its assignee(s), in cash (by check), by cancellation of all or a portion of any outstanding indebtedness of the Holder to the Company (or, in the case of repurchase by an assignee, to the assignee), or by any combination thereof within 30 days after receipt of the Notice or in the manner and at the times set forth in the Notice.

(e)    Holder's Right to Transfer.  If all of the Shares proposed in the Notice to be transferred to a given Proposed Transferee are not purchased by the Company and/or its assignee(s) as provided in this Section, then the Holder may sell or otherwise transfer such Shares to that Proposed Transferee at the Offered Price or at a higher price, provided that such sale or other transfer is consummated within 120 days after the date of the Notice, that any such sale or other transfer is effected in accordance with any applicable securities laws and that the Proposed Transferee agrees in writing that the provisions of this Section shall continue to apply to the Shares in the hands of such Proposed Transferee.  If the Shares described in the Notice are not transferred to the Proposed Transferee within such period, a new Notice shall be given to the Company, and the Company and/or its assignees shall again be offered the Right of First Refusal before any Shares held by the Holder may be sold or otherwise transferred.

(f)    Exception for Certain Family Transfers.  Anything to the contrary contained in this Section notwithstanding, the transfer of any or all of the Shares during the Optionee's lifetime or on the Optionee's death by will or intestacy to the Optionee's immediate family or a trust for the benefit of the Optionee's immediate family shall be exempt from the provisions of this Section.  "Immediate Family" as used herein shall mean spouse, lineal descendant or antecedent, father, mother, brother or sister.  In such case, the transferee or other recipient shall receive and hold the Shares so transferred subject to the provisions of this Section, and there shall be no further transfer of such Shares except in accordance with the terms of this Section.



(g)  Termination of Right of First Refusal.  The Right of First Refusal shall terminate as to any Shares upon (i) the first sale of Common Stock of the Company to the general public pursuant to a registration statement filed with and declared effective by the Securities and Exchange Commission under the Securities Act of 1933, as amended, (ii) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation, but excluding any merger effected primarily for the purpose of changing the domicile of the Company) in which the stockholders of the Company immediately prior to the transaction (or first step in such related transactions) do not retain at least fifty percent (50%) or more of the outstanding voting power of the Company; or (iii) a sale of all or substantially all of the assets of the Company.

6.  Tax Consultation.  Optionee understands that Optionee may suffer adverse tax consequences as a result of Optionee's purchase or disposition of the Shares. Optionee represents that Optionee has consulted with any tax consultants Optionee deems advisable in connection with the purchase or disposition of the Shares and that Optionee is not relying on the Company for any tax advice.

7.  Restrictive Legends and Stop-Transfer Orders.

(a)  Legends.  Optionee understands and agrees that the Company shall cause the legends set forth below or legends substantially equivalent thereto, to be placed upon any certificate(s) evidencing ownership of the Shares together with any other legends that may be required by the Company or by state or federal securities laws:

THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED UNLESS AND UNTIL REGISTERED UNDER THE ACT OR, IN THE OPINION OF COMPANY COUNSEL SATISFACTORY TO THE ISSUER OF THESE SECURITIES, SUCH OFFER, SALE OR TRANSFER, PLEDGE OR HYPOTHECATION IS IN COMPLIANCE THEREWITH.

THE SHARES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO CERTAIN RESTRICTIONS ON TRANSFER AND RIGHT OF FIRST REFUSAL OPTIONS HELD BY THE ISSUER OR ITS ASSIGNEE(S) AS SET FORTH IN THE EXERCISE NOTICE BETWEEN THE ISSUER AND THE ORIGINAL HOLDER OF THESE SHARES, A COPY OF WHICH MAY BE OBTAINED AT THE PRINCIPAL OFFICE OF THE ISSUER.  SUCH TRANSFER RESTRICTIONS AND RIGHT OF FIRST REFUSAL ARE BINDING ON TRANSFEREES OF THESE SHARES.



IT IS UNLAWFUL TO CONSUMMATE A SALE OR
TRANSFER OF THIS SECURITY, OR ANY INTEREST
THEREIN, OR TO RECEIVE ANY CONSIDERATION
THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF
THE COMMISSIONER OF CORPORATIONS OF THE STATE
OF CALIFORNIA, EXCEPT AS PERMITTED IN THE
COMMISSIONER'S RULES.

Optionee understands that transfer of the Shares may be restricted by
Section 260.141.11 of Title 10 of the California Code of Regulations, a copy of which is
attached to Exhibit B, the Investment Representation Statement.

(b)    Optionee agrees that, in order to ensure compliance with the
restrictions referred to herein, the Company may issue appropriate "stop transfer"
instructions to its transfer agent, if any, and that, if the Company transfers its own
securities, it may make appropriate notations to the same effect in its own records.

(c)    Refusal to Transfer. The Company shall not be required (i) to
transfer on its books any Shares that have been sold or otherwise transferred in violation
of any of the provisions of this Agreement or (ii) to treat as owner of such Shares or to
accord the right to vote or pay dividends to any purchaser or other transferee to whom
such Shares shall have been so transferred.

8.    Successors and Assigns. The Company may assign any of its rights under
this Agreement to single or multiple assignees, and this Agreement shall insure to the
benefit of the successors and assigns of the Company. Subject to the restrictions on
transfer herein set forth, this Agreement shall be binding upon Optionee and his or her
heirs, executors, administrators, successors and assigns.

9    Interpretation. Any dispute regarding the interpretation of this Agreement
shall be submitted by Optionee or by the Company forthwith to the Administrator which
shall review such dispute at its next regular meeting. The resolution of such a dispute by
the Administrator shall be final and binding on all parties.

10.    Governing Law; Severability. This Agreement is governed by the internal
substantive laws, but not the choice of law rules, of the State of California.

11.    Entire Agreement. The Plan and Option Agreement are incorporated
herein by reference. This Agreement, the Plan, the Restricted Stock Purchase
Agreement, the Option Agreement and the Investment Representation Statement
constitute the entire agreement of the parties with respect to the subject matter hereof and
supersede in their entirety all prior undertakings and agreements of the Company and
Optionee with respect to the subject matter hereof, and may not be modified adversely to
the Optionee's interest except by means of a writing signed by the Company and
Optionee.



Submitted by:                          Accepted by:

OPTIONEE:                              FORTINET, INC.

_____               _____
Signature                              Todd Nelson


_____               _____
Print Name                             Vice President, Legal and General Counsel

Address:

_____

_____

US Tax ID Number:

_____

                                       Date Received: _____, 20_____



**EXHIBIT B**

INVESTMENT REPRESENTATION STATEMENT

OPTIONEE:  Enrico Gargalo

COMPANY:  Fortinet, Inc.

SECURITY:  COMMON STOCK

AMOUNT:  14,285

DATE:  10/26/2006

In connection with the purchase of the above-listed Securities, the undersigned Optionee
represents to the Company the following:

(a)  Optionee is aware of the Company's business affairs and financial conditions and
has acquired sufficient information about the Company to reach an informed and knowledgeable
decision to acquire the Securities. Optionee is acquiring these Securities for investment for
Optionee's own account only and not with a view to, or for resale in connection with, any
"distribution" thereof within the meaning of the Securities Act of 1933, as amended (the
"Securities Act").

(b)  Optionee acknowledges and understands that the Securities constitute "restricted
securities" under the Securities Act and have not been registered under the Securities Act in
reliance upon a specific exemption therefrom, which exemption depends upon, among other
things, the bona fide nature of Optionee's investment intent as expressed herein. In this
connection, Optionee understands that, on the view of the Securities and Exchange Commission,
the statutory basis for such exemption may be unavailable if Optionee's representation was
predicated solely upon a present intention to hold these Securities for the minimum capital gains
period specified under tax statutes, for a deferred sale, for or until an increase or decrease in the
market price of the Securities, or for a period of one year or any other fixed period in the future.
Optionee further understands that the Securities must be held indefinitely unless they are
subsequently registered under the Securities Act or an exemption from such registration is
available. Optionee further acknowledges and understands that the Company is under no
obligation to register the Securities. Optionee understands that the certificate evidencing the
Securities will be imprinted with a legend which prohibits the transfer of the Securities unless
they are registered or such registration is not required in the opinion of counsel satisfactory to the
Company, a legend prohibiting their transfer without the consent of the Commissioner of
Corporations of the State of California and any other legend required under applicable state
securities laws.

(c)  Optionee is familiar with the provisions of Rule 701 and Rule 144, each
promulgated under the Securities Act, which, in substance, permit limited public resale of



"restricted securities" acquired, directly or indirectly from the issuer thereof, in a non-public offering subject to the satisfaction of certain conditions. Rule 701 provides that if the issuer qualifies under Rule 701 at the time of the grant of the Option to the Optionee, the exercise will be exempt from registration under the Securities Act. In the event the Company becomes subject to the reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, ninety (90) days thereafter (or such longer period as any market stand-off agreement may require) the Securities exempt under Rule 701 may be resold, subject to the satisfaction of certain of the conditions specified by Rule 144, including: (1) the resale being made through a broker in an unsolicited "broker's transaction" or in transactions directly with a market maker (as said term is defined under the Securities Exchange Act of 1934); and, in the case of an affiliate, (2) the availability of certain public information about the Company, (3) the amount of Securities being sold during any three month period not exceeding the limitations specified in Rule 144(e), and (4) the timely filing of a Form 144, if applicable.

In the event that the Company does not qualify under Rule 701 at the time of grant of the Option, then the Securities may be resold in certain limited circumstances subject to the provisions of Rule 144, which require the resale to occur not less than one year after the later of the date the Securities were sold by the Company or the date the Securities were sold by an affiliate of the Company, within the meaning of Rule 144; and, in the case of acquisition of the Securities by an affiliate, or by a non-affiliate who subsequently holds the Securities less than two years, the satisfaction of the conditions set forth in sections (1), (2), (3) and (4) of the paragraph immediately above.

(d)    Optionee further understands that in the event all of the applicable requirements of Rule 701 or 144 are not satisfied, registration under the Securities Act, compliance with the Regulation A, or some other registration exemption will not be required; and that, notwithstanding the fact that Rule 144 and 701 are not exclusive, the Staff of the Securities and Exchange Commission has expressed its opinion that persons proposing to sell private placement securities other than in a registered offering and otherwise than pursuant to Rule 144 and 701 will have a substantial burden of proof in establishing that an exemption from registration is available for such offers or sales, and that such persons and their respective brokers who participate in such transactions do so at their own risk. Optionee understands that no assurances can be given that any such other registration exemption will be available in such event.

(e)    Optionee understands that the certificate evidencing the Securities will be imprinted with a legend which prohibits the transfer of the Securities without the consent of the Commissioner of Corporations of California. Optionee has read the applicable Commissioner's Rules with respect to such restriction, a copy of which is attached.

Signature:

_____

Date: _____, 20_____



ATTACHMENT 1

STATE OF CALIFORNIA – CALIFORNIA ADMINISTRATIVE CODE
Title 10. Investment – Chapter 3. Commissioner of Corporations.

260.141.11: Restriction on Transfer. (a) The issuer of any security upon which a restriction on transfer has been imposed pursuant to Section 260.141.10 or 260.534 shall cause a copy of the section to be delivered to each issuee or transferee of such security at the time the certificate evidencing the security is delivered to the issuee or transferee.

(b)    It is unlawful for the holder of any such security to consummate a sale or transfer of such security, or any interest therein, without the prior written consent of the Commissioner (until this condition is removed pursuant to Section 260.141.12 of these rule), except:

(1)    to the issuer;
(2)    pursuant to the order or process of any court;
(3)    to any person described in Subdivision (i) of Section 25102 of the Code or Section 260.105.14 of these rules;
(4)    to the transferor's ancestors, descendants or spouse, or any custodian or trustee for the account of the transferor or the transferor's ancestors, descendants, or spouse; or to a transferee by a trustee or custodian for the account of the transferee or the transferee's ancestors, descendants or spouse;
(5)    to holders of securities of the same class of the same issuer;
(6)    by way of gift or donation inter vivos or on death;
(7)    by or through a broker-dealer licensed under the Code (either acting as such or as a finder) to a resident of a foreign state, territory or country who is neither domiciled in this state to the knowledge of the broker-dealer, nor actually present in this state if the sale of such securities in not in violation of any securities laws of the foreign state, territory or country concerned;
(8)    to a broker-dealer licensed under the Code in a principal transaction, or as an underwriter or member of an underwriting syndicate or selling group;
(9)    if the interest sold or transferred is a pledge or other lien given by the purchaser to the seller upon a sale of the security for which the Commissioner's written consent is obtained or under this rule not required;
(10)    by way of a sale qualified under Sections 25111, 25112, 25113 or 25121 of the Code, of the securities to be transferred, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(11)    by a corporation to a wholly owned subsidiary or such corporation, or by a wholly owned subsidiary of a corporation to such corporation;
(12)    by way of an exchange qualified under Section 25111, 25112 or 25113 or the Code, provided that no order under Section 25140 or subdivision (a) of Section 25143 is in effect with respect to such qualification;
(13)    between residents of foreign states, territories or countries who are neither domiciled nor actually present in this state;



(14)    to the State Controller pursuant to the Unclaimed Property Law or to the administrator of the unclaimed property law of another state; or

(15)    by the State Controller pursuant to the Unclaimed Property Law or by the administrator of the unclaimed property law of another state, in either such case, such person (i) discloses to potential purchasers at the sale that transfer of the securities is restricted under this rule; (ii) delivers to each purchaser a copy of this rule; and (iii) advises the Commissioner of the name of each purchaser;

(16)    by a trustee to a successor trustee when such transfer does not involve a change in the beneficial ownership of the securities;

(17)    by way of an offer and sale of outstanding securities in an issuer transaction that is subject to the qualification requirement of Section 25110 of the Code but exempt from that qualification requirement by subdivision (f) of Section 25102; provided that any such transfer is on the condition that any certificate evidencing the security issued to such transferee shall contain the legend required by this section.

(c)    The certificates representing all such securities subject to such a restriction on transfer, whether upon initial issuance or upon any transfer thereof, shall bear on their face a legend, prominently stamped or printed thereon in capital letter of not less that 10-point size, reading as follows:

"IT IS UNLAWFUL TO CONSUMMATE A SALE OR TRANSFER OF THIS SECURITY, OR ANY INTEREST THEREIN, OR TO RECEIVE ANY CONSIDERATION THEREFOR, WITHOUT THE PRIOR WRITTEN CONSENT OF THE COMMISSIONER OF CORPORATIONS OF THE STATE OF CALIFORNIA, EXCEPT AS PERMITTED IN THE COMMISSIONER'S RULES."



JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Enrico Gargale

**DEFENDANTS**

Fortinet, Inc.

08/3167 PVT

**(b)** County of Residence of First Listed Plaintiff  Italy
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Santa Clara County
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Shook, Hardy & Bacon L.L.P.
333 Bush Street, Suite 600
San Francisco, CA 94104-2828
(415) 544-1900

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

1 U.S. Government Plaintiff
2 U.S. Government Defendant
3 Federal Question (U.S. Government Not a Party)
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated or Principal Place of Business In This State | 4 | ☒ 4 |
| Citizen of Another State | 2 | 2 | Incorporated and Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

CONTRACT
- 110 Insurance
- 120 Marine
- 130 Miller Act
- 140 Negotiable Instrument
- 150 Recovery of Overpayment & Enforcement of Judgment
- 151 Medicare Act
- 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- 153 Recovery of Overpayment of Veteran's Benefits
- 160 Stockholders' Suits
- 190 Other Contract
- 195 Contract Product Liability
- 196 Franchise

REAL PROPERTY
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

TORTS
PERSONAL INJURY
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury

PERSONAL INJURY
- 362 Personal Injury— Med. Malpractice
- 365 Personal Injury— Product Liability
- 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

FORFEITURE/PENALTY
- 610 Agriculture
- 620 Other Food & Drug
- 625 Drug Related Seizure of Property 21 USC 881
- 630 Liquor Laws
- 640 R.R. & Truck
- 650 Airline Regs.
- 660 Occupational Safety/Health
- 690 Other

LABOR
- 710 Fair Labor Standards Act
- 720 Labor/Mgmt. Relations
- 730 Labor/Mgmt.Reporting & Disclosure Act
- 740 Railway Labor Act
- 790 Other Labor Litigation
- 791 Empl. Ret. Inc. Security Act

CIVIL RIGHTS
- 441 Voting
- 442 Employment
- 443 Housing/ Accommodations
- 444 Welfare
- 445 Amer. w/Disabilities- Employment
- 446 Amer. w/Disabilities- Other
- 440 Other Civil Rights

PRISONER PETITIONS
- 510 Motions to Vacate Sentence
Habeas Corpus:
- 530 General
- 535 Death Penalty
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition

IMMIGRATION
- 462 Naturalization Application
- 463 Habeas Corpus – Alien Detainee
- 465 Other Immigration Actions

BANKRUPTCY
- 422 Appeal 28 USC 158
- 423 Withdrawal 28 USC 157

PROPERTY RIGHTS
- 820 Copyrights
- 830 Patent
- 840 Trademark

SOCIAL SECURITY
- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

FEDERAL TAX SUITS
- 870 Taxes (U.S. Plaintiff or Defendant)
- 871 IRS—Third Party 26 USC 7609

OTHER STATUTES
- 400 State Reapportionment
- 410 Antitrust
- 430 Banks and Banking
- 450 Commerce
- 460 Deportation
- 470 Racketeer Influenced and Corrupt Organizations
- 480 Consumer Credit
- 490 Cable/Sat TV
- 810 Selective Service
- 850 Securities/Commodities/ Exchange
- 875 Customer Challenge 12 USC 3410
- 890 Other Statutory Actions
- 891 Agricultural Acts
- 892 Economic Stabilization Act
- 893 Environmental Matters
- 894 Energy Allocation Act
- 895 Freedom of Information Act
- 900Appeal of Fee Determination Under Equal Access to Justice
- 950 Constitutionality of State Statutes

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
2 Removed from State Court
3 Remanded from Appellate Court
4 Reinstated or Reopened
5 Transferred from another district (specify)
6 Multidistrict Litigation
7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 USC 1332 (a)
Brief description of cause:
Breach of contract and torts.

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes  No

## VIII. RELATED CASE(S) IF ANY
PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)
SAN FRANCISCO/OAKLAND  ☒ SAN JOSE

DATE
July 1, 2008

SIGNATURE OF ATTORNEY OF RECORD